J-A14013-17
J-A14014-17
J-A14015-17

2017 PA Super 312

| | |
|---|---|
| ARUN KRISHNAN AND ARUNA ARUN NARAYANAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |
| THE CUTLER GROUP, INC., | |
| Appellant | No. 2614 EDA 2016 |

Appeal from the Judgment Entered August 24, 2016
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2012-02209-CT

| | |
|---|---|
| ARUN KRISHNAN AND ARUNA ARUN NARAYANAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| THE CUTLER GROUP, INC., D/B/A THE DAVID CUTLER GROUP, | |
| Appellee | No. 2745 EDA 2016 |

Appeal from the Judgment Entered August 24, 2016
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2012-02209-CT

| | |
|---|---|
| ARUN KRISHNAN AND ARUNA ARUN NARAYANAN, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellees | |
| v. | |

J-A14013-17
J-A14014-17
J-A14015-17

THE CUTLER GROUP, INC.,

Appellant      No. 2613 EDA 2016

Appeal from the Judgment Entered August 24, 2016
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2012-02209-CT

ARUN KRISHNAN AND ARUNA NARAYANAN,

     IN THE SUPERIOR COURT OF PENNSYLVANIA

Appellees

v.

THE CUTLER GROUP, INC., D/B/A THE DAVID CUTLER GROUP,

Appellant      No. 2828 EDA 2016

Appeal from the Judgment Entered August 24, 2016
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2012-02209-CT

BEFORE: BENDER, P.J.E., BOWES, J., and SHOGAN, J.

OPINION BY BENDER, P.J.E.:      **FILED OCTOBER 02, 2017**

Appellant, The Cutler Group, Inc. (referred to herein as "Cutler"), appeals and Appellees, Arun Krishnan and Aruna Arun Narayanan, cross-appeal from the August 24, 2016 judgment entered in favor of Appellees.[1]

---

[1] Pursuant to Pa.R.A.P. 513, we *sua sponte* consolidate the parties' pending appeals and cross appeal. **See** Pa.R.A.P. 513 (providing that where there is more than one appeal from the same order, the appellate court may, in its discretion, order them to be consolidated). As discussed further, *infra*, Cutler filed separate appeals from: (1) the trial court's July 12, 2016 order
*(Footnote Continued Next Page)*

- 2 -

J-A14013-17
J-A14014-17
J-A14015-17

After careful review, we affirm in part, vacate the judgment entered with respect to attorneys' fees, and remand.

*(Footnote Continued)* ─────────────

regarding Appellees' motions for post-trial relief and the judgment entered on August 10, 2016 (referred to herein as "First Appeal" and docketed at 2614 EDA 2016); (2) the trial court's July 12, 2016 order denying Cutler's motion for post-trial relief and the judgment entered on August 10, 2016 (referred to herein as "Second Appeal" and docketed at 2613 EDA 2016); and (3) the trial court's July 12, 2016 order regarding Appellees' motion for post-trial relief, the judgment entered on August 10, 2016, and the trial court's August 16, 2016 order granting, in part, Appellees' supplemental request for attorneys' fees and costs (referred to herein as "Third Appeal" and docketed at 2828 EDA 2016). In addition, Appellees filed a cross-appeal from the trial court's July 12, 2016 order regarding Appellees' post-trial motions and the trial court's August 16, 2016 order denying, in part, Appellees' request for additional attorneys' fees and costs (referred to herein as "Cross-appeal" and docketed at 2745 EDA 2016).

We note that an order denying post-trial motions is interlocutory and generally not appealable. *See Levitt v. Patrick*, 976 A.2d 581, 584 n.2 (Pa. Super. 2009) (stating that appeal properly lies from the entry of judgment, not from the order denying post-trial motions). Here, Cutler filed a praecipe to enter judgment on August 10, 2016; however, at that point, the trial court had not fully disposed of Appellees' post-trial motion, as Appellees' request for supplemental attorneys' fees remained outstanding. Thus, we consider the August 10, 2016 judgment as being premature. The trial court subsequently awarded Appellees supplemental attorneys' fees on August 16, 2016, and final judgment was entered on August 24, 2016, in the total amount of $317,668.78. Therefore, we consider these appeals as taken from the August 24, 2016 entry of final judgment, and we deem Cutler's appeals before that judgment as proper. *See Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc*., 77 A.3d 1, 2 n.1 (Pa. Super. 2013) ("[E]ven though [an] appeal was filed prior to the entry of judgment, it is clear that jurisdiction in appellate courts may be perfected after an appeal notice has been filed upon the docketing of a final judgment.") (quoting *Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 513 (Pa. Super. 1995)).

J-A14013-17
J-A14014-17
J-A14015-17

In the decision it issued following the jury and non-jury trials in this matter, the trial court set forth the procedural history of this case as follows:

> This matter arises from [Appellees'] purchase of a home built by … Cutler in a development located in East Whiteland Township, Pennsylvania[,] known as Malvern Hunt. [Appellees] allege that … Cutler improperly constructed their home which resulted in chronic water infiltration and damage to the home. After learning of its construction failures, [Appellees] allege that Cutler proceeded to engage in a series of unlawful conduct in order to hide the home's significant water problems and avoid its promise and obligation to repair their home. In their complaint, [Appellees] asserted claims for breach of contract, breach of express warranty, breach of implied warranty of habitability, breach of implied warranty of reasonable workmanship, and violations of the Pennsylvania Unfair Trade Practice and Consumer Protection Law ("UTPCPL").
>
> There being no right to a jury trial under the UTPCPL, the court scheduled the jury trial on [Appellees'] common law claims to begin on December 7, 2015. The non-jury trial on [Appellees'] UTPCPL claims was scheduled to commence at the conclusion of the jury trial. On December 9, 2015, after three trial days, the jury returned a verdict in favor of [Appellees] and against [Cutler] on all of [Appellees'] common law claims.
>
> On January 11 and 15, 2016, the court held a bench trial on [Appellees'] UTPCPL claims. Having already heard evidence related to the common law claims, during the bench trial the court simply took additional evidence specifically related to [Appellees'] UTPCPL claims, the damages available thereunder[,] and [Appellees'] request for attorneys' fees and costs. At the conclusion of the bench trial, the court requested that the parties provide proposed findings of fact and conclusions of law as well as written closing arguments. The parties filed the required submissions with the court.

- 4 -

J-A14013-17
J-A14014-17
J-A14015-17

Trial Court Decision (TCD), dated 2/11/2016, at 1-2.[2]

Ultimately, in light of the evidence set forth during the jury and non-jury trials relating to the UTPCPL claims — along with the parties' post-trial submissions — the trial court found in favor of Appellees on their UTPCPL claims and awarded damages, costs, and attorneys' fees in the total amount of $232,475.72 plus interest.[3] In doing so, the trial court made the following factual findings:

1. On August 24, 2002, [Appellees] entered into an Agreement of Sale to purchase a residential home located at 31 Cameron Court, Exton, Pennsylvania (hereinafter the "Home") in the Ridings of Malvern Hunt, a residential development located in East Whiteland Township, Pennsylvania (hereinafter "Malvern Hunt").

2. [Cutler] is the developer of Malvern Hunt and, through its agents, constructed [Appellees'] Home.

3. On October 1, 2002, [Appellees] proceeded with settlement and took possession of the Home.

4. In connection with the sale, [Appellees] received a written warranty from Cutler which provided, among other things, that (a) Cutler built the Home in accordance with the accepted home building practices of the locality, and (b) prior to delivery, Cutler's trained personnel had inspected the Home (the "Warranty").

---

[2] Although this decision was dated February 11, 2016, it was not entered on the docket until March 2, 2016.

[3] Specifically, at the time of the trial court's February 11, 2016 decision, the jury's verdict amounted to $85,980.94, and Appellees received attorneys' fees and costs through January 1, 2016 in the amount of $121,938.51 and $24,556.27, respectively. *See* Trial Court Order Awarding and Conforming Damages From Bench Trial With Jury's Verdict, dated 2/11/2016, at 1 (single, unnumbered page).

5. On October 1, 2002, [Appellees] executed the Warranty.

6. Cutler's former employee, project supervisor, and Quality Control manager, Justin McCarty ("Mr. McCarty"), supervised the construction of the Malvern Hunt development, including [Appellees'] home.

7. Although he was the lead construction supervisor on site during the construction of Cutler's stucco-clad homes (of which [Appellees'] home was one), Mr. McCarty had little knowledge in 2002 of the proper application of stucco.

8. Mr. McCarty testified that he did not know what constituted correct versus incorrect stucco practice.

9. Neither Mr. McCarty nor anyone else at Cutler performed inspections of the Home to ensure that windows, flashing components or stucco were installed correctly.

10. Yet, prior to 2002, Cutler had received complaints from homeowners in at least one other Cutler-built stucco community, Springton Woods, about water infiltration resulting from, among other things, improper flashing, improper window installation, improper thickness of stucco, and other construction defects.

11. William Wheatley ("Mr. Wheatley"), an architect retained by the homeowners of Springton Woods, testified that as a result of those complaints window and destructive testing took place in Springton Woods, which he attended and observed in 2000 with Cutler's President and CEO, David Cutler ("Mr. Cutler"), and other professionals.

12. Mr. Wheatley testified that after that inspection, he discussed with Mr. Cutler missing flashing components, excessive staple patterns, improper installation of windows, and non-code compliant stucco.

13. Mr. Wheatley testified that he advised Mr. Cutler that these construction issues were contributing to water infiltration in Springton Woods and suggested that Cutler address these issues.

14. In April 2005, [Appellees] complained to Cutler's service department of water infiltration in their Home. [Appellees]

- 6 -

first observed water infiltration in the downstairs powder room.

15. In May 2005, Cutler sent agents to the Home to perform repairs consisting of spackling, painting and caulking the damaged areas in the powder room. Cutler also caulked around a window in the upstairs bathroom and applied spray foam insulation behind the window trim beneath the sill.

16. Following the May 2005 work, Cutler's agents advised [Appellee Narayanan] that the water infiltration issue had been addressed and that no further action was necessary.

17. In September 2006, [Appellees] discovered additional water infiltration in the same downstairs powder room as well as in a new location – the downstairs study.

18. In response, Cutler sent agents to the Home on two occasions – once in September 2006 and once in October 2006 – to perform repairs consisting of, among other things, drywall repair and cutting and sealing in the windows above the study.

19. This type of repair already had proven to be ineffective in solving the problem.

20. Despite knowing from the first "repair" that caulking would not solve the problem or address the source of the water infiltration, following the September and October 2006 service, Cutler's agents again advised [Appellee Narayanan] that the water infiltration issue had been addressed and that no further action was necessary.

21. Cutler failed to perform any testing or inquire further into the source, cause, or extent of the water infiltration in [Appellees'] Home.

22. In February 2010, [Appellees] discovered yet more water infiltration in the downstairs powder room where Cutler's agents had performed repairs in 2005 and 2006.

23. Cutler initially denied [Appellees'] claims out-of-hand, indicating that the Home was out of warranty.

24. In or around April 2010, [Appellees] began looking themselves for answers. They engaged Craig D. Tillman ("Mr.

Tillman") to conduct an inspection of the Home. Mr. Tillman thereafter prepared an inspection report.

25. Mr. Tillman's report identified certain defective construction conditions and practices at the Home.

26. [Appellees] provided Cutler with a copy of the report.

27. In June 2010, after receiving a copy of Mr. Tillman's inspection report, Cutler sent Mr. McCarty, now employed by McCarty Home Services, LLC ("McCarty Home Services"), to inspect the Home.

28. During his inspection, Mr. McCarty commented to [Appellee] Krishnan, who was present, that the walls of [Appellees'] Home were "like butter."

29. Mr. McCarty too prepared a written report in connection with his inspection. He recommended that certain essential repairs be made to [Appellees'] Home.

30. [Appellees] requested a copy of Mr. McCarty's report, but Cutler refused to provide a copy to [Appellees] at that time.

31. In July 2010, Cutler twice promised [Appellees], in writing, that Cutler would repair the Home.

32. Cutler represented that it had added [Appellees'] Home to a rip-and-tear program, and that Cutler had issued a work order to McCarty Home Services to perform the repairs.

33. With the July 29, 2010 letter, Cutler enclosed a confidentiality agreement, demanding that [Appellees] agree not to discuss, among other things, the construction, repair, or conveyance of the Home by Cutler with anyone except family members or [Appellees'] attorney(s) and accountant(s).

34. [Appellees] signed and returned the confidentiality agreement included with Cutler's July 29, 2010 letter.

35. Cutler did not follow through with scheduling the repair work, prompting [Appellee] Krishnan to contact Mr. McCarty in September 2010.

36. Mr. McCarty indicated to [Appellee] Krishnan that Cutler had not issued a work order to McCarty Home Services.

37. [Appellees] again followed up with Cutler.

38. Thereafter, [Appellees] received a letter from Cutler, dated October 4, 2010, indicating that Cutler had "developed new methods for successful repair" of the water infiltration "problem" in [Appellees'] Home.

39. In the October 4, 2010 letter, Cutler demanded, for the first time, that [Appellees] provide evidence that they had "sealed" their Home within a year of purchase. Further, Cutler reported to have not received the first confidentiality agreement sent to [Appellees] on July 29, 2010.

40. Cutler enclosed another, this time different, confidentiality agreement removing the carve-out permitting [Appellees] to speak with family members or an attorney about the repairs.

41. Cutler never did issue a work order to McCarty Home Services to perform the repairs outlined in the July 29, 2010 letter.

42. In January and March 2011, Cutler engaged Tom Adams Windows and Carpets, Inc. (hereinafter "Adams"), to perform repairs to [Appellees'] Home.

43. [Appellees] believed that Cutler was sending Adams to their Home to perform the "new methods for the successful repair of the problems" with their Home as described in Cutler's October 4, 2010 letter to [Appellees].

44. Instead, Adams's repairs at [Appellees'] Home in March 2011 for a third time consisted of the same unsuccessful "remedy" employed by Cutler — cleaning, caulking, and sealing around windows.

45. Cutler was billed $375 for the work.

46. Cutler employee, Christopher Heuges, referred to these Adams repairs as the "typical service" in a January 31, 2011 email to Tom Adams's employee, Mindy Friedmann.

47. Adams's service manager, Bob Hertlein, indicated that additional tests were necessary and available to diagnose the cause of continuing water infiltration if Adams's service work was unsuccessful[,] including removing and inspecting the windows for signs of improper installation or flashing.

48. Cutler knew the same service had been unsuccessful in dealing with [Appellees'] Home, but it failed to perform the additional test identified by Mr. Hertlein or otherwise perform repairs following Adams's service.

49. Having received the "caulk and seal" service now more than once, [Appellees] retained the services of a certified master inspector, John Lukowski, to determine the cause of their systemic water infiltration.

50. In August and October 2011, Mr. Lukowski performed a visual inspection and subsequently observed destructive testing at the Home.

51. Destructive testing revealed numerous construction defects and evidence of significant water infiltration on all elevations of the Home.

52. Mr. Lukowski recommended that [Appellees] remove all stucco, repair damaged substrate materials, replace nonconforming house wrap materials, and re-apply stucco at the proper thickness with required flashing and drainage components.

53. [Appellees] engaged Narvon Exteriors, LLC to do the work for the base price of $82,000. Remediation of [Appellees'] Home began in April 2012.

54. During the stucco removal, Mr. Lukowski documented dozens of violations of standard construction industry practice and the building code applicable to the construction of [Appellees'] Home, including improper window lapping, excessive stapling, missing flashing, improper window installation, broken window flanges, improper roofline flashing, use of inferior and non-compliant building materials, and use of an underweight and improper weather resistive barrier.

55. Cutler's two coat stucco application was determined to be between ¼ and ½ inch thick throughout the Home.

56. Mr. Lukowski documented substantial damage to OSB, framing elements, insulation, and other components of the Home. He observed massive holes, rotten insulation, OSB that resembled "mulch," toxic molds of varying species, and mushrooms growing in interior wall spaces.

57. Cutler denied liability, asserting initially that "homeowner maintenance" was to blame for the systemic water infiltration.

58. Cutler failed to cooperate during the discovery phase of this litigation. Between the months of February 2014 through October 2014, the [c]ourt entered five discovery orders related to Cutler's incomplete document production, often involving water infiltration claims in other Cutler-built homes. [Appellees were] required to respond to multiple motions for reconsideration and motions to quash filed by Cutler relative to these same discovery matters.

59. On October 14, 2014, the court granted [Appellees'] Motion for Sanctions and awarded [Appellees] monetary sanctions and a conditional adverse inference charge regarding more than a dozen homes for which Cutler provided no information (the "October 14, 201[4] Order").

60. By October 14, 2014 Order, the court had already scheduled and rescheduled trial in this matter more than once. Thereafter, the court established a firm trial date of October 27, 2014.

61. On October 22, 2014, less than three business days before trial, Cutler appealed the court's October 14, 2014 Order to the Pennsylvania Superior Court. Cutler filed a motion with this court requesting an order permitting it to appeal the sanctions order as of right and it filed a petition with the Superior Court under a separate docket for allowance of appeal by permission.

62. [Appellees] had incurred significant fees and costs preparing for trial in October 2014.

63. [Appellees] then incurred additional legal expenses during the months of October 2014 through January 2015 defending against Cutler's appeals, which the Superior Court questioned, *sua sponte*, and ultimately quashed in January 2015.

64. On December 7, 2015, [Appellees] proceeded to trial on their claims for breach of contract and breach of express and implied warranties.

65. On the afternoon of December 9, 2015, the court charged the [j]ury.

66. The jury returned a verdict that day in favor of [Appellees] on all counts in the amount of $85,980.94, which represented the cost incurred by [Appellees] to investigate and remediate the Home.

67. The non-jury phase of the trial was to immediately follow at the conclusion of the jury phase.

68. On December 10, 2015, Cutler submitted to the court four "Pre-Trial Memoranda" raising numerous evidentiary and dispositive issues. The [c]ourt continued the bench trial to permit [Appellees] time to respond to the filings.

69. Cutler subsequently filed an omnibus Motion in Limine and for Summary Judgment seeking to dismiss [Appellees'] UTPCPL claim or limit evidence supporting the same. [Appellees] responded thereto.

70. The court denied both motions by Order dated January 6, 2016.

71. On January 11 and 15, 2016, the court heard evidence on [Appellees'] UTPCPL claim.

TCD at 2-11 (internal citations and original brackets omitted).

Following the bench trial, the trial court found in favor of Appellees on their UTPCPL claim. Thereafter, Cutler filed a motion for post-trial relief on March 11, 2016. On March 21, 2016, Appellees also filed a post-trial motion. The trial court ruled on both parties' motions on July 12, 2016. First, with respect to Appellees' post-trial motion, the trial court entered an order in which it granted Appellees' request for prejudgment interest in the amount of $69,329.20; denied their request for an award of the full extent of the attorneys' fees incurred in this case; granted in part Appellees' request for an award of attorneys' fees and costs incurred in responding to Cutler's post-trial motions; directed Appellees to submit for the court's

consideration a statement setting forth the attorneys' fees and costs incurred since January 1, 2016; and, finally, denied Appellees' request that the court treble the jury's award pursuant to the UTPCPL. *See* Trial Court Order Regarding Appellees' Post-Trial Motion, 7/12/2016, at 1-2 (unnumbered pages). Second, the trial court entered a separate order denying Cutler's post-trial motion that "contain[ed] seventy-nine … paragraphs … purport[ing] to identify the multitude of errors that occurred during the jury and non-jury phases of this litigation." *See* Trial Court Order Denying Cutler's Post-Trial Motion, 7/12/2016, at 1 n.1 (unnumbered pages).[4]

---

[4] Cutler similarly lacks brevity on appeal. This Court has pointed out that,

> it has been held that when an appellant raises an extraordinary number of issues on appeal … a presumption arises that there is no merit to them. In *United States v. Hart*, 693 F.2d 286, 287 n.1 (3[d] Cir. 1982), the court had an opportunity to address this situation:

>> Because of the inordinate number of meritless objections pressed on appeal, spotting the one bona fide issue was like finding a needle in a haystack. One of our colleagues has recently cautioned on the danger of "loquaciousness:"

>>> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that this is an irrebuttable presumption, but it is a

*(Footnote Continued Next Page)*

Subsequently, in conformance with the trial court's July 12, 2016 order directing Appellees to file a statement setting forth the attorneys' fees and costs incurred since January 1, 2016, Appellees filed a supplemental request for additional attorneys' fees and costs in the amount of $69,551.36 on July 26, 2016. **See** Appellees' Supplemental Request for Attorneys' Fees and Costs Pursuant to July 12, 2016 Court Order, 7/26/2016, at 1-2 (unnumbered pages). While that request was pending, Cutler filed a praecipe to enter judgment in the amount of $301,804.92 on August 10, 2016.[5] The next day, on August 11, 2016, Cutler filed two notices of appeal: first, a notice of appeal from the trial court's July 12, 2016 order regarding Appellees' motion for post-trial relief and the judgment entered on August 10, 2016; and, second, a notice of appeal from the trial court's July 12, 2016

---

*(Footnote Continued)* ───────────

> presumption nevertheless that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.
>
> Aldisert, *The Appellate Bar: Professional Competence and Professional Responsibility—A View From the Jaundiced Eye of One Appellate Judge*, 11 Cap.U.L.Rev. 445, 458 (1982).

**Estate of Lakatosh**, 656 A.2d 1378, 1380 n.1 (Pa. Super. 1995).

[5] Cutler explained that the amount of $301,804.92 resulted from the trial court's February 11, 2016 order awarding $232,475.22, and its July 12, 2016 order granting Appellees' prejudgment interest in the amount of $69,329.20.

order denying Cutler's motion for post-trial relief and the judgment entered on August 10, 2016.

On August 16, 2016, the trial court entered an order granting in part Appellees' Supplemental Request for Attorneys' Fees and Costs Pursuant to its July 12, 2016 order.[6,7] On August 24, 2016, Appellees filed a praecipe to enter final judgment in the amount of $317,668.78, to reflect these additional amounts. Judgment was entered that day. Then, on August 25, 2016, Appellees filed a notice of cross-appeal, challenging the trial court's July 12, 2016 order regarding their post-trial motion and its August 16, 2016 order regarding their supplemental request for attorneys' fees and costs. Further, on August 26, 2016, Cutler filed an amended notice of appeal, in which it challenged the trial court's August 16, 2016 order regarding Appellees' request for supplemental attorneys' fees.

---

[6] Specifically, the trial court additionally awarded attorneys' fees to Appellees in the amount of $13,254.00, and costs in the amount of $2,609.86.

[7] We note that under Pennsylvania Rule of Appellate Procedure 1701(b)(6), "[a]fter an appeal is taken …, the trial court … may … [p]roceed further in any matter in which a non-appealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal or a petition for review of the order." Pa.R.A.P. 1701(b)(6).

The trial court instructed the parties to file a Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal, and they timely complied. On appeal, Cutler presents the following nineteen issues for our review:[8]

    A. Did the trial court commit an error of law and abuse its discretion in awarding [Appellees] attorneys['] fees, and/or in not discounting the attorney[s'] fees, costs and expert fees when case law requires the fees to be discounted?

    B. Did the trial court commit an error of law and abuse its discretion in awarding [Appellees] expert fees when the law in Pennsylvania does not allow a party to recover expert fees?

    C. Did the trial court commit an error of law and abuse its discretion in awarding [Appellees] pre-judgment interest when under Pennsylvania law they were not entitled to pre-judgment interest?

    D. Did the trial court commit an error of law and abuse its discretion in awarding [Appellees] attorney[s'] fees pursuant to their UTPCPL claim in additional amounts for the time period between January 1, 2016 to August 16, 2016 and/or in not discounting the attorney[s'] fees when case law requires the fees to be discounted and when under Pennsylvania law they are not entitled to the additional fees?

    E. Did the trial court commit an error of law and abuse its discretion in awarding [Appellees] costs pursuant to their UTPCPL claim in additional amounts incurred for the litigation costs in prosecuting their claim and/or in not discounting the costs when case law requires the costs to be discounted and when under Pennsylvania law they are not entitled to the additional costs?

_____

[8] We compiled the issues presented by Cutler in each of its three briefs, but do not repeat issues it raised in multiple briefs in the list above.

- 16 -

F. Did the trial court commit an error of law and abuse its discretion by allowing the jury to consider a claim under the breach of the express warranty as the evidence did not support such a claim?

G. Did the trial court commit an error of law and abuse its discretion by finding that [Cutler] breached an express warranty when the jury's verdict under the claims of breach of express warranty was against the weight of the evidence presented at trial?

H. Did the trial court commit an error of law and abuse its discretion in finding that [Cutler] breached an implied warranty of habitability and reasonable workmanship because the jury's findings under the claims of breach of the implied warranty of habitability and reasonable workmanship were against the weight of the evidence?

I. Did the trial court commit an error of law and abuse its discretion by allowing the jury to consider a claim under the breach of implied warranty of habitability and implied warranty of reasonable workmanship as the evidence did not support such a claim?

J. Did the trial court commit an error of law and abuse its discretion in finding that [Cutler] violated the [UTPCPL] by breaching an express warranty?

K. Did the trial court commit an error of law and abuse its discretion in refusing to dismiss [Appellees'] claims under the [UTPCPL] when the claim was barred by the statute of limitations?

L. Did the trial court commit an error of law and abuse its discretion in finding that [Cutler] violated the [UTPCPL] when [Appellees] should not have been permitted to show reliance outside of the agreement of sale under the parol evidence rule?

M. Did the trial court commit an error of law and abuse its discretion in finding that [Cutler] violated the [UTPCPL] when [Appellees] did not prove justifiable reliance?

N. Did the trial court commit an error of law and abuse its discretion in finding that [Appellees] met their burden of

proof under the [UTPCPL] when they did not prove fraud by clear and convincing evidence?

O. Did the trial court commit an error of law and abuse its discretion by finding that [Appellees] were not required to establish the common law elements of fraud in order to support their claims under the [UTPCPL]?

P. Did the trial court commit an error of law and abuse its discretion in finding that [Cutler] had engaged in a practice of deceptive conduct in violation of the [UTPCPL] when the weight of the evidence did not support such a finding?

Q. Did the trial court commit an error of law and abuse its discretion in not granting a mistrial when [Appellees] submitted new evidence, ex parte, after the conclusion of the trial?

R. Did the trial court commit an error of law and abuse its discretion in allowing evidence of water damage in other homes when the evidence was not probative and it was highly prejudicial?

S. Did the trial court commit an error of law and abuse its discretion in allowing William A. Wheatley to provide expert testimony when he was called as a fact witness and never qualified as an expert?

Cutler's Brief (First Appeal) at 4-5; Cutler's Brief (Second Appeal) at 4-7 (unnecessary capitalization and emphasis omitted).[9]

First, Cutler argues that "the trial court erred in awarding … Appellees attorneys['] fees and not discounting the fees awarded[.]"  Cutler's Brief (First Appeal) at 14 (unnecessary capitalization and emphasis omitted).  In particular, it argues that the trial court erred in awarding Appellees attorneys' fees in the amount of $121,938.51, and "in failing to discount the

_____

[9] We address Appellees' cross-appeal, *infra.*

fees to only the amount of time spent on the UTPCPL claim." *Id.* Cutler

points out that Appellees "brought claims for breach of contract, breach of

express warranty, breach of implied warranties, and violations of the

[UTPCPL,]" and insists that "Appellees simply cannot recover all of their

attorney[s'] fees in this case, as it is clear that only time spent on the

UTPCPL is recoverable." *Id.* at 15, 17. Further, Cutler challenges the

testimony of Appellees' counsel that "there was no way for him to partition

out the claims." *Id.* at 16 (citation omitted). Appellees, on the other hand,

declare that "all of [their] claims arise out of the same common core of

facts. In fact, [their] common law claims form the very basis of their

UTPCPL claim." Appellees' Brief (First Appeal) at 32 (citations and quotation

marks omitted).

We examine such claims for an abuse of discretion. *See Boehm v.*

*Riversource Life Ins. Co.*, 117 A.3d 308, 335 (Pa. Super. 2015). By way

of background,

> [t]he general purpose of the UTPCPL is to protect the public from
> fraud and unfair or deceptive business practices. The UTPCPL,
> by virtue of the following language, authorizes the trial judge to
> grant a successful litigant an award for additional damages,
> reasonable attorney fees, and costs:
>
>> Any person who purchases or leases goods or services
>> primarily for personal, family or household purposes and
>> thereby suffers any ascertainable loss of money or
>> property, real or personal, as a result of the use or
>> employment by any person of a method, act or practice
>> declared unlawful by section 3 of this act, may bring a
>> private action to recover actual damages or one hundred
>> dollars ($100), whichever is greater. The court may, in its

discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. **The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.**

73 P.S. § 201-9.2(a).

**Neal v. Bavarian Motors, Inc.**, 882 A.2d 1022, 1029-30 (Pa. Super. 2005) (emphasis added; some citations omitted).

We have stated that "a court in awarding attorney[s'] fees under the UTPCPL must … eliminate from the award of attorney[s'] fees the efforts of counsel to recover on non-UTPCPL theories." **Id.** at 1031-32. Simply put, "there is no statutory authority for awarding attorney[s'] fees for the time spent pursuing non-UTPCPL counts." **Id.** at 1032 (original brackets, internal quotation marks, and citations omitted). Notwithstanding, this Court has also recognized the difficulty in differentiating the time spent pursuing UTPCPL claims from non-UTPCPL claims. For instance, we have noted that "where the plaintiffs are proceeding on multiple theories of relief, including under the UTPCPL, it is difficult to parse out the time between the UTPCPL claim and other causes of action." **Boehm**, 117 A.3d at 335. In such scenarios, "[m]uch of the time spent in pre-trial litigation would relate to both UTPCPL and common law causes of action." **Id.**

Here, Cutler contends that while Appellees' counsel "would have the [c]ourt believe all of these fees are intertwined[,] it defies logic that every minute spent and every email sent went towards the UTPCPL claims and that

- 20 -

the fees could not be reasonably reduced." Cutler's Brief (First Appeal) at 16. In contrast, the trial court acknowledged that Appellees "litigated multiple theories of relief based upon similar yet complicated facts all at once." TCD at 26. It further explained:

> [T]he parties proceeded with the jury trial on the common law claims before proceeding to a bench trial on the UTPCPL claim. … In arguing that the fees should have been separately billed, [Cutler] during cross-examination of [Appellees'] counsel pointed out as an example that at the outset of this litigation[,] [Cutler] filed preliminary objections to the complaint's non-UTPCPL claims, including an objection based upon the "gist of the action" doctrine. Having reviewed those objections again, the court is reminded that the objections also challenged [Appellees'] UTPCPL claims. Rather than undermining [Appellees'] position, this example actually supports [Appellees'] assertion that a separation of fees would be difficult in this case.

TCD at 27. Thus, the trial court reasonably concluded that the time spent by counsel in litigating this case often encompassed both Appellees' UTPCPL and common law causes of action, and would be difficult to divide given the common underlying facts. Consequently, we discern no abuse of discretion by the trial court in not discounting the fee awards.

Second, Cutler claims that "the trial court erred in awarding … [Appellees] expert fees." Cutler's Brief (First Brief) at 17 (unnecessary emphasis and capitalization omitted). Cutler advances a two-fold argument in support: first, it claims that "[t]here is no automatic right to expert fees under the UTPCPL"; second, it states that "Appellees' expert, John Lukowski[,] only testified at the trial for breach of contract and breach of warranties." *Id.*

- 21 -

With respect to the first prong of Cutler's argument, we reiterate that the UTPCPL provides that "[t]he court **may** award to the plaintiff … costs and reasonable attorney fees" as well as "such additional relief as it deems necessary or proper." 73 P.S. § 201-9.2 (emphasis added). Here, the trial court explained its decision to award expert fees, stating:

> Similar to attorneys' fees, the right to recover expert fees as costs under the UTPCPL, although not required, does exist if those fees are reasonable and connected to the UTPCPL claims. **See Skurnowicz v. Lucci**, 798 A.2d 788 (Pa. Super. 2002) (considering [the] plaintiffs' request for expert fees, although denying after determination that expert's plan failed to lead to a solution and thus fees deemed unreasonable); **Neal**, 882 A.2d at 102[9] (finding that because there was no dispute retention of an expert who prepared a pretrial report and testified at trial was necessary, trial judge did not abuse discretion in awarding partial reimbursement for cost of expert[])[.] The court heard [Appellees'] evidence on the costs incurred in this litigation and the expert fees they incurred and the reason and purpose thereof. It concludes that the expert services rendered to [Appellees] ultimately assisted [them] in proving liability on the part of [Cutler]. The court concludes those expert fees were reasonable and appropriate and should be awarded. As the court in **McCauslin v. Reliance Fin. Co.**, 751 A.2d 683 (Pa. Super. 2005), recognized with regard to attorneys' fees, "it is far more in keeping with the intent of the legislation that the claimant be made whole and not have to diminish his recovery by paying attorney[s'] fees." The court believes the same logic applies when considering an award of costs, including expert fees.

TCD at 30-31 (some citations omitted). Thus, while there is no automatic right to expert fees, the trial court reasonably exercised its discretion to award them to Appellees.

With respect to the second aspect of Cutler's argument, Appellees emphasize that they "relied on Mr. Lukowski's testimony in support of their UTPCPL claim." Appellees' Brief (First Appeal) at 40 (citation omitted). They discuss that "[a]t the beginning of the Bench Trial [on Appellees' UTPCPL claim], [Appellees'] counsel stated on the record his intention to incorporate and rely upon the testimony and evidence presented during the Jury Trial (including Mr. Lukowski's testimony) in support of [Appellees'] UTPCPL claim." *Id.* at 39-40 (citation omitted).

Indeed, our review of the record reveals the following exchange between Appellees' counsel and the trial court:

> [Appellees' Attorney:] [] As you know, your Honor, ***this is a bench trial, which is a continuation of the jury trial in this matter.***
>
> As previously indicated to the [c]ourt and opposing counsel, ***it is my intention to introduce -- supplement the record and rely upon specifically and incorporate the testimony and evidence that was provided at the jury trial in this matter. And I understand that the [c]ourt is in agreement with this procedure.***
>
> [Trial Court:] Yes. I certainly don't need to hear the same evidence a second time. It doesn't make sense. I was here all throughout the jury trial, and the jury has spoken as to the evidence, which you heard.
>
> You may need to remind me of one point or another. But, no. I think you're correct on how I view it.
>
> [Appellees' Attorney:] Thank you, your Honor.
>
> It would be my intention, to the extent I bring up prior testimony, it will be brief and for the purpose of just refreshing your Honor's recollection of the testimony.

N.T. Trial, 1/11/2016, at 3 (emphasis added). Thus, Appellees did rely on Mr. Lukowski's testimony to advance their UTPCPL claim. Accordingly, we are unpersuaded by Cutler's arguments, and believe the trial court appropriately awarded expert fees to Appellees.

Third, Cutler claims that the trial court erred in awarding Appellees prejudgment interest under the Restatement (Second) of Contracts § 354. **See** Cutler's Brief (First Appeal) at 19.[10] To begin, Cutler asserts that "parties are only entitled to prejudgment interest as a matter of law where damages are liquidated[,]" and thereby contends that the trial court incorrectly determined that "the damages were liquidated because the value of remediation services could be ascertained by market value[,]" which "circumvents the clear definition of liquidated damages." **Id.** (citation and unnecessary emphasis and capitalization omitted). In addition, Cutler avers that the trial court also could not have properly exercised its discretion to award prejudgment interest to Appellees because they "were never out of pocket any monies due to the alleged breach of [Cutler]." **Id.** at 28. In our view, both of these arguments are meritless.

"[A] court has discretion to award or not award prejudgment interest on some claims, but must or must not award prejudgment interest on

---

[10] As mentioned above, the trial court awarded Appellees $69,329.20 in prejudgment interest. Cutler does not challenge the amount of prejudgment interest, but rather the fact that it was awarded at all.

others." **Cresci Const. Services, Inc. v. Martin**, 64 A.3d 254, 258 (Pa. Super. 2013) (quoting, in part, **Fidelity Bank v. Com. Marine and Gen. Assurance Co.**, 592 F.Supp. 513, 522 (E.D. Pa. 1984)) (internal quotations and original brackets omitted).  In accordance, Pennsylvania has followed the Restatement (Second) of Contracts § 354, which provides:

> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.
>
> (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Restatement (Second) of Contracts § 354.  Further, the comments to this section state, in pertinent part:

> c. Where amount due is sufficiently definite. Under the rule stated in Subsection (1), a party is not chargeable with interest on a sum unless its amount is fixed by the contract or he could have determined its amount with reasonable certainty so that he could have made a proper tender.  Unless otherwise agreed, interest is always recoverable for the non-payment of money once payment has become due and there has been a breach. This rule applies to debts due for money lent, goods sold or services performed, including installments due on a construction contract.  The fact that the breach has spared some expense that is uncertain in amount does not prevent the recovery of interest.  The sum due is sufficiently definite if it is ascertainable from the terms of the contract, as where the contract fixes a price per unit of performance, even though the number of units performed must be proved and is subject to dispute.  The same is true, even if the contract does not of itself create a money debt, if it fixes a money equivalent of the performance.  **It is also true, even if the contract does not fix a money equivalent of the performance, if such an equivalent can be determined from established market prices.  The fact**

> *that the extent of the performance rendered and the existence of the market price must be proved by evidence extrinsic to the contract does not prevent the application of these rules*.
>
> …
>
> *d. Discretionary in other cases.* Damages for breach of contract include not only the value of the promised performance but also compensation for consequential loss. The amount to be awarded for such loss is often very difficult to estimate in advance of trial and cannot be determined by the party in breach with sufficient certainty to enable him to make a proper tender. ***In such cases, the award of interest is left to judicial discretion, under the rule stated in Subsection (2), in the light of all the circumstances, including any deficiencies in the performance of the injured party and any unreasonableness in the demands made by him***.

Restatement (Second) of Contracts § 354 cmts. c, d (emphasis added).

> This Court has expounded on Section 354 as follows:

> [Section] 354 commands that prejudgment interest is awarded as a matter of right in four limited circumstances, which all require an examination of the contract. In other words, a court examines whether the contract was to pay, or render a performance for, a monetary amount defined in the contract; render a performance for a monetary amount that can be calculated from standards set forth in the contract; ***or render a performance for a monetary amount calculated from the established market prices. The disputed amount must be either specified in the contract or ascertained from the terms of the contract such that at the time of the breach, the breaching party can proffer a tender***. The disputed amount, in other words, must be liquidated at the time of the breach as a prerequisite for prejudgment interest. In all other circumstances, including an award of consequential damages, prejudgment interest is awarded as a matter of discretion.

***Cresci***, 64 A.3d at 264-65 (emphasis added; internal citations omitted).

To illustrate, in ***Cresci***, the appellant entered into a contract with a construction company for it to build a home for the appellant for $184,730.

*Id.* at 256. Aside from the cost of building the home, "the contract did not specify or refer to any monetary values, established market prices, or other fixed standards regarding a determination of mortgage expenses, legal expenses, inspection fees, and the costs of maintaining two homes in the event of a breach." *Id.* After some time, the construction company filed a complaint against the appellant, alleging that the appellant impeded the efforts of the construction company in completing the contract, and claimed that the appellant owed $34,378.56 on the balance of the contract. *Id.* at 256-57. In turn, the appellant counterclaimed for, *inter alia*, breach of contract, asserting that the construction company "had failed to complete several of the contract's required obligations." *Id.* at 257. Following a jury trial, the jury found that the construction company breached the contract and awarded the appellant $66,000 in breach-of-contract damages. *Id.* However, the trial court did not award the appellant prejudgment interest, determining that "the damages involved in this matter are simply not of the kind envisioned by § 354(1) of the Restatement[,]" and that the appellant "was adequately compensated by the jury's verdict, and no further prejudgment interest was warranted." *Id.* at 258 (citations omitted).

On appeal, the appellant argued that "pre-judgment interest in a breach of contract matter is a legal right." *Id.* (citation omitted). He averred that "he was forced to incur additional mortgage expenses, legal expenses, inspection fees, and associated costs with maintaining two

properties since the home was uninhabitable[,]" and "theorize[d] that because the sums he claim[ed] [were] ascertainable, § 354(1) of the Restatement (Second) of Contracts applie[d] and § 354(2) … [did] not." ***Id.*** (internal quotation marks and citations omitted). This Court, however, disagreed. Significantly, we observed that the appellant did "not argue that the contract provided for the payment of additional mortgage expenses, legal expenses, inspection fees, and associated costs with maintaining two properties[,]" or that "these sums constituted the reasonable costs of completing the construction contract or correcting the defective work." ***Id.*** (internal quotation marks and citations omitted). Further, we reasoned:

> In the case before us, we examine the contract to determine whether [the a]ppellant is entitled to prejudgment interest as of right. The contract specifically provided for the performance of a construction of a home in exchange for $184,730, a monetary amount defined by the contract. Thus, $184,730 is a liquidated, ascertainable sum.
>
> The contract, however, did not provide for a "performance" of "mortgage expenses, legal expenses, inspection fees, and associated costs with maintaining two properties." The contract also did not reference or permit a calculation of a monetary value for those items. ***[The construction company], therefore could not have tendered a proffer to [the a]ppellant for those items, which necessarily required a breach of contract to render a "performance" of those items. [The construction company] is not charged with interest as of right on the jury's award of $66,000, because that amount was not fixed by the construction contract and [the construction company] could not have ascertained that sum by construing the terms of the contract.*** Accordingly, the jury's non-specific award of $66,000 does not represent a liquidated, ascertainable sum owed under the contract.

> The jury's award … "represents a loss incurred by [the a]ppellant *as a consequence*" of [the construction company's] breach "of the promised performance" to construct the home. Thus, contrary to [the a]ppellant's claim, an award of prejudgment interest on consequential damages is not awarded as a matter of right but is instead left to the court's discretion. [The a]ppellant, however, elected not to order the trial transcript. Thus, this Court cannot ascertain whether the trial court abused its discretion in declining to award prejudgment interest on an unliquidated sum.

*Cresci*, 64 A.3d at 264-66 (internal citations, original brackets, footnotes omitted; some emphasis in original).

In the case *sub judice*, the trial court considered *Cresci* and found it distinguishable in multiple ways, most notably in that Appellees' damages constituted the cost of correcting Cutler's defective performance under the parties' contract. It reasoned:

> The contract between the parties, like the contract in *Cresci*, was for the construction of a home for a negotiated sum. [Appellees] argued at trial, and in their post-trial motion, that part and parcel of [Cutler's] agreement to construct their home was the agreement to build that home (as set forth in the contract's language) in accordance with industry practice and standards. [Appellees] contend that they demonstrated at trial that when it came to the stucco in particular, [Cutler] did not fulfill its contractual, performance obligation. ***Thus, according to [Appellees], the first requirement of Cresci — a contract to render a performance for a monetary amount — has been demonstrated.***
>
> [Cutler] counters that the amount on which [Appellees] seek interest does not relate to a "performance" contracted for by the parties. [Cutler] argues that "remediation work" was not part of the contract and not part of [Cutler's] agreed to performance.
>
> ***The court agrees with [Appellees] that the damages sought, and awarded in this case, represent the cost of correcting the defective performance undertaken by [Cutler]. [Appellees'] breach of contract claim was not***

*based upon a contractual obligation to remediate, but centered upon [Cutler's] failure to perform the construction in accordance with the contract's terms.* [Cutler] mistakenly directs this court's attention to the fact that the ***Cresci*** court denied the applicant's request for interest on mortgage expenses, legal expenses and similar costs related to maintaining a second property while the contracted home was completed. Although the court did refuse to award interest on such sums, in analyzing whether the amount requested was part of the contract[,] the court offered the following material distinction with regard to the appellant's request. The Superior Court wrote[:]

> [The appellant] does not argue that the contract provided for the payment of additional mortgage expenses, legal expenses, inspection fees, and associated costs with maintaining two properties ... [The appellant] also does not argue *that these sums constituted the reasonable costs of completing the construction contract or correcting the defective work.*

[]***Cresci***, 64 A.3d at 258[] (emphasis added[])[.]

What [the] appellant failed to argue in ***Cresci***, is exactly what [Appellees] argue here. *[Cutler] contracted to perform the construction of their home in accordance with certain standards and failed to render the contractually agreed upon performance. The nature of the claim in this case falls squarely within the parameters of the parties' contract.*

As for whether or not the underlying debt is a liquidated sum, as defined in the Restatement and ***Cresci***, the court concludes that it is. Admittedly, the contract does not set forth a fixed amount for each phase of construction, for example, the value of the stucco application and material. *However, damages can be considered "ascertainable from the contract" even if the contract is silent.* In such a case, if the value of the breached performance is "ascertainable from established market prices of the subject matter," prejudgment interest shall be awarded. At trial, [Appellees] presented evidence of market proposals they obtained and provided to [Cutler] that detailed the cost of completing and fixing their home's construction in order to bring it into compliance with the contract's terms. The evidence at

> trial also showed that [Cutler] also obtained its own proposal for completing the necessary work. ***Thus, at the time [Appellees] became aware of the breach, the amount of the debt owed was certain and ascertainable such that [Cutler] could have offered tender, if it had so desired.*** Pre-judgment interest is thus warranted.

Trial Court Order Regarding Appellees' Post-Trial Motion, 7/12/2016, at 1 n.1 (original brackets omitted; some emphasis in original). We agree with the trial court's analysis, and believe that it properly determined that prejudgment interest was warranted as a matter of right under Section 354(1).

Nevertheless, even if not awardable as a matter of right, the trial court would not have abused its discretion in awarding prejudgment interest to Appellees under Section 354(2). ***See*** Trial Court Order Regarding Appellees' Post-Trial Motion, 7/12/2016, at 1 n.1 ("[I]f … pre[]judgment interest was not due [Appellees] as a matter of right, the court would nonetheless exercise its discretion and award such interest to [Appellees]."). Cutler claims that prejudgment interest awarded pursuant to the court's discretion is "characterized as compensation for delay of damages[,]" and is appropriately awarded to prevent unjust enrichment and in situations where the delay in compensation was attributable to the party opposing prejudgment interest. Cutler's Brief (First Appeal) at 26-27 (internal quotation marks ad citation omitted). According to Cutler, it "did not unduly delay or hold any property or money of … Appellees." ***Id.*** at 28.

We disagree. To start with, Appellees rightly assert that Cutler was unjustly enriched because they "paid Cutler nearly one-half million dollars for a Home built contrary to the performance Cutler promised [them] under the Agreement and the Warranty." Appellees' Brief (First Appeal) at 48. Furthermore, "[a]fter Cutler failed to fulfill its many promises to repair [Appellees'] Home, [they] paid $85,980.94 out-of-pocket to bring their Home in compliance with the standards and codes that Cutler fraudulently promised to [Appellees] in the Warranty." *Id.* at 48-49 (citation omitted). We concur that "Cutler's conduct deprived [Appellees] of the ability to use this money for other purposes and also deprived [them] of the interest that would have accrued on [their] money had it been saved or invested." *Id.* at 49. Additionally, "[i]n 2010, Cutler acknowledged the existence of the defects in the Home, but still failed to correct them, despite repeatedly promising [Appellees], in writing, that Cutler would correct the defects, and despite warranting at the time of purchase that Cutler had constructed the Home according to industry standards and codes." *Id.* (citations omitted).

The trial court also determined that Appellees did not perform deficiently or make unreasonable demands of Cutler in a way that would inhibit it from awarding them prejudgment interest under Section 354(2):

> The court concludes that given all the circumstances, it sees no deficiencies in the performance of [Appellees] as the injured parties or any unreasonableness in the demands made by them that would preclude the court from exercising its discretion. To the contrary, having heard the evidence and testimony over the course of the jury and non-jury portions of the case, it is clear to

> the court that [Appellees] did everything that was asked of them by [Cutler] and provided [Cutler] multiple opportunities to correct its deficiencies. The result of which is that [Appellees] paid for a performance that was never rendered and should be entitled to interest on those monies.

Trial Court Order Regarding Appellees' Post-Trial Motion, 7/12/2016, at 1 n.1. Thus, in light of the above considerations, we discern no abuse of discretion by the trial court in awarding prejudgment interest under Section 354(2).

Fourth and fifth, Cutler argues that "the trial court erred in awarding Appellees additional costs and attorneys['] fees for the time period after January 1, 2016[.]" **See** Cutler's Brief (First Appeal) at 28 (unnecessary capitalization and emphasis omitted).[11,12] This Court is "mindful that we may not disturb a trial judge's assessment of these amounts unless there has been an abuse of discretion." **Richards v. Ameriprise Financial, Inc.**, 152 A.3d 1027, 1038 (Pa. Super. 2016) (citation omitted).

Cutler argues that the trial court's "award of the additional fees and costs constitutes a windfall for … Appellees." Cutler's Brief (First Appeal) at

---

[11] We consider Cutler's fourth and fifth issues together because Cutler has briefed them as a single issue. **See** Cutler's Brief (First Appeal) at 28-32.

[12] Cutler reiterates the same arguments here that attorneys' fees and costs should be discounted as there is "no statutory authority for awarding attorney[s'] fees for time spent pursing [*sic*] non-UTPCPL counts." Cutler's Brief (First Appeal) at 30 (citation and internal quotation marks omitted). Because we have already rejected this argument, *supra*, we do not duplicate our analysis here.

30. Specifically, Cutler claims that "[t]he time spent on the UTPCPL bench trial and any motions or responses drafted after the trial all fall under … Appellees' contingent fee agreement. This agreement represents the full attorneys' fees in this case." *Id.* at 32.[13] In short, Cutler seems to claim that the trial court improperly relied upon the UTPCPL's fee-shifting provision to award Appellees additional attorneys' fees and costs, given that there was a contingency agreement — instead of an hourly fee agreement — between Appellees and their counsel. *Id.* at 31.

Cutler proffers no authority in support of this particular argument. *See id.* at 30-32. As such, we determine it is waived. *See Lackner v. Glosser*, 892 A.2d 21, 29-30 (Pa. Super. 2006) (stating that "arguments which are not appropriately developed are waived[,]" and that "[a]rguments not appropriately developed include those where the party has failed to cite any authority in support of a contention") (citations omitted).

Further, even if not waived, we would still permit Appellees to receive attorneys' fees and costs pursuant to their UTPCPL claim in additional amounts for the time period between January 1, 2016 to August 16, 2016. Cutler has not convinced us that the trial court abused its discretion because

---

[13] Cutler explains that Appellees "entered into a contingent fee agreement on August 13, 2015. Before that time[, Appellees] had been paying their attorneys by billed hours." Cutler's Brief (First Appeal) at 32 (citation omitted).

"Appellees never expected to pay the hourly fees or costs recorded after August 13, 2015, and … Appellees' attorneys never expected to collect those fees or costs."  Cutler's Brief (First Appeal) at 31.  We have opined before that "it would be inappropriate to apply a contingency fee agreement to create a ceiling (or for that matter, a closed door) on the recovery of attorneys' fees under a fee-shifting provision of a remedial statute."  **Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 791 (Pa. Super. 2006).  Additionally, Cutler's underlying contention that Appellees did not expect to pay — and their counsel did not expect to receive payment for — costs after August 13, 2015, is not supported by the record.  **See** Cutler's Brief (First Appeal) at 31.  Appellees' contingency agreement sets forth that Appellees are "responsible for expenses[,]" which "are those costs which relate to the investigation and prosecution of your claim[.]"  **See** Appellees' Exhibit 61.  Therefore, Cutler's argument would fail for this reason as well.

Sixth, Cutler asserts that "[t]he trial court erred in allowing the jury to consider a claim under the breach of the express warranty as the evidence did not support such a claim[.]"  Cutler's Brief (Second Appeal) at 19 (unnecessary capitalization and emphasis omitted).[14]  It argues that "[i]t

---

[14] "When reviewing the sufficiency of the evidence, this Court must determine whether the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the verdict winner, was sufficient to enable the factfinder to find against the losing party."  **Bannar v. Miller**, 701 A.2d 232, 238 (Pa. Super. 1997) (citation omitted).  We note that, "[a]
*(Footnote Continued Next Page)*

was error of law to allow the Jury to consider … Appellees' Claim under Breach of Express Warranty" because "[i]t had been made clear at [t]rial, through the entry of the Warranty into evidence, and through testimony, that the Warranty had expired well before any complaints were made by … Appellees." *Id.* at 20.  To support its argument, Cutler elaborates:

> [] Appellees made settlement on the home in question on October 1, 2002.  The Warranty is dated October 1, 2002, and it was executed by the parties on the date of settlement.  The Warranty specifically states that "Seller warrants said premises to be free of structural or mechanical defects for a period of one year from the date of settlement."[15]  Appellee … Krishan testified to the same during his direct testimony at trial.  The Warranty further states that[,] "During the second year after

*(Footnote Continued)* ⸻⸻⸻⸻⸻

challenge to the sufficiency of the evidence in a civil case is reviewed on appeal as a claim that the trial court erred in denying a motion for judgment notwithstanding the verdict…." ***Atlantic LB, Inc. v. Vrbicek***, 905 A.2d 552, 557 (Pa. Super. 2006) (citations omitted).

[15] For context, this paragraph — referred to as "Paragraph 1" — states:

> 1. Seller shall assign to the Buyer all manufacturer's guarantees and service warranties held by Seller, including but not limited to Roof, Plumbing, Heating, and Air Conditioning, and kitchen appliances.  Seller warrants said premises to be free of structural or mechanical defects for a period of one (1) year from the date of settlement, and Seller shall be responsible for the correction of such defects found at the premises during said one (1) year period, and shall act with reasonable promptness to repair, reconstruct or otherwise correct at Seller's sole discretion such defects upon receipt of notice in writing from Buyer of any such structural or mechanical defects, and after Seller inspects same at said premises.

Appellees' Exhibit 10.

commencement date, the builder continues to warrant that the home will be free from major construction defects and that the plumbing, electrical, heating and cooling systems will perform according to the approved standards, unless their failure is the result of a defect in an appliance, fixture, or item of equipment."[16]  Again, Appellee [Krishnan] testified to the same during his direct examination.  Apellee [*sic*] … Krishnan testified that he was aware that the stucco application is warranted for one year.

***The Warranty further warrants that … "In addition, seller specifically warrants as follows, but not in limitation of the general warranty stated above: (a), Your home has been constructed in accordance with the accepted home building practices of this locality and prior to delivery has been inspected by our trained personnel as well as the building inspector."***[17]  There is no language extending this warranty.

Appellee [Krishnan] further testified that "the first leak that we saw that concerned us was in 2005."  At that time[, Appellees] experienced leaks in the windows and powder room.  There is no

---

[16] This portion, referred to as "Paragraph 2," sets forth:

> 2. <u>Coverage During Second Year.</u>  During the second year after the commencement date, the Builder continues to warrant that the home will be free from <u>major construction defects</u> and that the plumbing, electrical, heating and cooling systems will perform according to the Approved Standards, unless their failure is the result of a defect in an appliance, fixture, or item of equipment.  A major construction defect is actual damage to the load-bearing portion of the home (including damage due to subsidence, expansion, or lateral movement of soil from causes other than flood or earthquake) which affects its load-bearing function and which vitally affects (or is imminently likely to produce a vital effect on) the use of the home for residential purposes.

Appellees' Exhibit 10 (emphasis in original).

[17] This provision is referred to as "Paragraph 3(a)."

evidence that any water infiltration occurred prior to 2005. [Appellees] did not provide any proof that the warranty extended past the proscribed [*sic*] obvious one year coverage.

*Id.* at 16-17 (internal citations omitted; emphasis added). Based on the foregoing, Cutler contends that "[t]he Express Warranty had expired by two years when … Appellees raised complaints to [Cutler]. There was nothing presented to show that the Warranty was extended past the given one or two years, proscribed [*sic*] within the four corners of the Warranty." *Id.* at 20.

In response, Appellees argue that Paragraph 3(a) of the Warranty, quoted above, is not limited in time or scope. *See* Appellees' Brief (Second Appeal) at 28. We agree. Appellees aptly discern:

The introductory language—"***In addition***, seller specifically warrants as follows, ***but not in limitation of the general warranty stated above***"—establishes that the representations and warranties set forth in Paragraph 3 are separate and distinct from, and "in addition" to, those representations and warranties included in Paragraphs 1 and 2. Thus, the representations and warranties in Paragraph 3(a) are not dependent upon or limited by those in the two preceding paragraphs. Further, the plain language of Paragraph 3(a) does not temporally limit the representations and warranties therein. Thus, the trial court correctly held that Cutler did not temporally limit the representations and warranties in Paragraph 3(a).[13] Holding otherwise would have required the trial court to read additional language into the Warranty….

[13] The fact that Paragraph 3(a) is not temporally limited is logical because, unlike some other paragraphs of the Warranty, which warrant against the failure of certain systems in the Home for a specific period of time, Paragraph 3(a) warrants that the Home was built as it should have been—*i.e.*, in accordance with applicable standards and codes.

*Id.* at 29 (internal citations; emphasis in original). In light of the language in Paragraph 3(a), we determine that there was evidence to support Appellees' breach of express warranty claim. Cutler warranted that Appellees' home had been constructed in accordance with the accepted home building practices of their locality and was inspected by Cutler's trained personnel as well as the building inspector before delivery to Appellees. Despite Cutler's contentions, the language of Paragraph 3(a) simply does not reflect that this warranty was limited to one or two years, and had expired. As a result, the trial court did not err in instructing the jury on the breach of express warranty claim.

Seventh, Cutler relatedly maintains that "the trial court erred by refusing to grant a new trial because the jury's verdict under the breach of express warranty claim was against the weight of the evidence presented at trial[.]" Cutler's Brief (Second Appeal) at 16 (emphasis and unnecessary capitalization omitted). Cutler contends that "[i]n the matter at hand the evidence is not conflicting, … Appellees admitted that the Warranty executed on October 1, 2002, was a limited warranty, and specified that it covers periods of one (1) year, or two (2) years dependent upon the defect." *Id.* at 17. Thus, according to Cutler, "[t]he facts and evidence are clear that the warranty had expired before there were any issues with the home. … The stucco was clearly warranted for only one year." *Id.* at 18. Consequently, Cutler claims that "[t]he Jury's verdict was clearly against the weight of the

evidence as no warranty existed at the time … Appellees experienced any water infiltration in their home." *Id.*

Initially, we note that "[t]his Court's review of a weight claim is a review of the trial court's exercise of discretion, not of the underlying question of whether we believe that the verdict is against the weight of the evidence." *Alwine v. Sugar Creek Rest, Inc.*, 883 A.2d 605, 611 (Pa. Super. 2005) (citation and internal quotation marks omitted). Moreover, "[a] new trial will be granted on the basis that the jury's verdict is against the weight of the evidence only when the verdict is so contrary to the evidence as to shock one's sense of justice. In reviewing the trial court's refusal to grant a new trial on this basis, this Court reviews all of the evidence." *Id.* (citations omitted).

The crux of Cutler's weight argument is that no warranty existed at the time water infiltrated Appellees' home in 2005. However, as explained above, we agree with Appellees that "the representations and warranties in Paragraph 3(a) were *unlimited* in time." Appellees' Brief (Second Appeal) at 31 (emphasis in original). Further, as stated by the trial court, *supra*, there was evidence presented that "[d]uring the stucco removal, Mr. Lukowski documented *dozens* of violations of standard construction industry practice and the building code applicable to the construction of [Appellees'] Home…." *See* TCD at 8 (emphasis added); Appellees' Brief (Second Appeal) at 3. Thus, given Paragraph 3(a) and that Appellees' home had numerous

violations in contravention of the representations and warranties made by Cutler, we do not deem the verdict to be so contrary to the evidence as to shock one's sense of justice. **See Alwine**, 883 A.2d at 611.

Eighth, Cutler insists that "[t]he court erred in allowing the jury to consider a claim under the breach of implied warranty of habitability and breach of implied warranty of workmanlike construction as the evidence did not support the claim[.]" Cutler's Brief (Second Appeal) at 24 (unnecessary capitalization and emphasis omitted).[18] Cutler advances two arguments to support this claim: first, it states that "Appellees failed to plead or adduce facts that any of the alleged defects rendered their home unfit to live in"; and, second, that "the Agreement of Sale and Express Warranty provided to … Appellees clearly limited any other warranty, specifically implied warranties. … [T]he implied warranties were only covered for a one year period." **Id.** at 21, 22, 24 (citations omitted). We find both of these contentions to be unpersuasive.

With respect to whether Appellees' home was habitable, Cutler's main argument is that "[t]here was simply no evidence provided at trial that … Appellees['] home, either as constructed or after the alleged defects were

_____

[18] We restate that "[w]hen reviewing the sufficiency of the evidence, this Court must determine whether the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the verdict winner, was sufficient to enable the factfinder to find against the losing party." **Bannar**, 701 A.2d at 238 (citation omitted).

discovered, was uninhabitable.  [] Appellees never claimed or adduced facts that the home could not be inhabited, and in fact, they resided in the[] home full[-]time since making settlement." ***Id.*** at 23.  Yet, Cutler proffers very little authority in support of its contention that if Appellees were able to live in their home, the implied warranty of habitability was not breached.

> This Court has previously discussed the warranty of habitability:
>
> The implied warranty of habitability is a warranty based in a contract for the sale of a home.  ***See Tyus v. Resta***, [476 A.2d 427, 431 (Pa. Super. 1984)].  This implied warranty was first recognized in Pennsylvania in ***Elderkin v. Gaster***, … 288 A.2d 771 ([Pa.] 1972).  In ***Elderkin*** the Pennsylvania Supreme Court recognized that as warranties were rarely given in home construction contracts, and there was a wide disparity in knowledge between the buyer and the seller, a theory of implied warranties was necessary to safeguard the reasonable expectations of the buyer.  The Court reasoned:
>
>> One who purchases a development home ... justifiably relies upon the skill of the developer that the house will be a suitable living unit ...[.]  The builder-vendor impliedly warrants that the home he has built and is selling is constructed in a reasonably workmanlike manner and that it is fit for the purposes intended—habitation.
>
> ***Id.*** at … 776.  Warranties of habitability and reasonable workmanship are not created by representations of the builder-vendor but rather are implied in law and as such exist independent of any representations of a builder-vendor.  ***See Tyus***[,] 476 A.2d at 433.

***Ecksel v. Orleans Const. Co.***, 519 A.2d 1021, 1026 (Pa. Super. 1987).

In ***Ecksel***, the builder-vendor argued that the trial court "erred in finding that a leaky basement breached the warranty of habitability." ***Id.*** at 1026.  However, this Court upheld the trial court's decision, explaining:

- 42 -

> A house is a shelter. The whole purpose of building shelter is to protect individuals and their property from the elements—wind, water, fire, earth, etc. A basement is part of the overall pursuit of this protection. The [homeowner] proved that the basement cannot be used even for storage. A continually wet basement indicated the owner of the resident [*sic*] may not rely on a part of that residence to protect individuals from at least one of the elements—water. The purpose of building a house is undone by the [builder-vendor's] improper construction created [*sic*] a premises unfit for human dwelling.

> Additionally, there is precedent to uphold such a finding. In ***Tyus*** … this Court upheld a lower court finding that a leaky crawlspace breached the warranty of habitability. ***We will not overturn the lower court's determination that the leaky basement in this case breached both the implied warranties of habitability and reasonable workmanship.***

***Ecksel***, 519 A.2d at 1026-27 (citations omitted; emphasis added). ***See also Davis v. Northridge Development Associates***, 622 A.2d 381, 387 (Pa. Super. 1993) (determining that implied warranty of habitability was not met where the residence had "a cracked and leaking foundation").

> Here, Appellees reasonably explain:

> [T]he construction defects that [Appellees] alleged in their Complaint and ultimately established at trial are far more serious than the conditions found to constitute breaches of the [i]mplied [w]arranties in ***Ecksel***, ***Davis***, and ***Tyus.*** Cutler's own agent, Mr. McCarty, told [Appellee] Krishnan the walls in the Home were "like butter" and areas of the Home were "clearly rotten." [Appellees] had to use buckets to hold falling water in various rooms of the Home and several walls became discolored due to water infiltration. The interior walls of [Appellees'] Home were so wet that mushrooms sprouted.

> Moreover, Mr. Lukowski documented substantial damage to OSB, framing elements, insulation, and other components of the Home. He observed massive holes, rotten insulation, OSB resembling "mulch," and toxic molds. In fact, Mr. Lukowski documented significant damage resulting from water infiltration

on ***every elevation*** of the Home. [Appellees] incurred $85,980.94 in costs investigating and remediating the Home—costs far below the amount Cutler characterized as the "best price" for such substantial work.

The above evidence supported a finding that the defects at issue seriously detracted from the value of the Home and cost [Appellees] nearly $100,000.00 to investigate and correct. Thus, the jury could certainly conclude that Cutler breached the Implied Warranties.

Appellees' Brief (Second Appeal) at 33-34 (internal citations omitted; emphasis in original). We agree with Appellees that the water infiltration supported their claim for breach of implied warranties, even though Appellees continued living in the home.

Next, to show that the trial court erred in instructing the jury on the issue of breach of implied warranties due to insufficient evidence, Cutler avers that the implied warranties of habitability and workmanlike construction "had expired when … Appellees raised complaints to … [Cutler]." Cutler's Brief (Second Appeal) at 25. It states:

[T]he Agreement of Sale and Express Warranty provided to … Appellees clearly limited any other warranty, specifically implied warranties. The clear and unambiguous language of the Express Warranty states, "Implied warranties of the builder will last only as long as the term of this written warranty." The Express Warranty … is limited to a one (1) year term. [] Appellees signed and executed the Express Warranty. It follows that the implied warranties were only covered for a one year period.

***Id.*** at 22 (internal citations omitted).

But, in limiting implied warranties, this Court has previously instructed that,

> [b]ecause of the special knowledge of the builder-vendor in a home construction situation, language purportedly creating an express restriction or exclusion of an implied warranty must be strictly construed against the builder-vendor. Additionally, due to the important consumer interests protected by an implied warranty, any attempt to disclaim such a warranty must be clear and unambiguous. ***The language must also be specific and particular to the legal rights the buyer is waiving and their relation to their effect on specifically designated potential latent defects.*** Evidence that the parties actually negotiated the release will tend to indicate that the purchaser made a knowing waiver of his or her rights.

***Ecksel***, 519 A.2d at 1025 (internal citations omitted; emphasis added).[19]

As Appellees observe, "the language in the Warranty does not mention 'habitability' or 'reasonable workmanship.' It simply uses the generic term 'implied warranties.' Thus, the language did not provide [Appellees] with adequate notice of the specific implied warranty protections they were purportedly waiving by signing the Warranty." Appellees' Brief (Second Appeal) at 35 (citations omitted). Furthermore, Appellees point out that "the Warranty is silent on potential defects," and that "the supposed 'limiting' language in the Warranty was not negotiated by the parties; it was part of Cutler's boilerplate Warranty." ***Id.*** Due to these deficiencies, we cannot conclude that the implied warranties of habitability and reasonable

---

[19] ***See also Pontiere v. James Dinert, Inc.***, 627 A.2d 1204, 1206 (Pa. Super. 1993) ("[A] builder-vendor may not exclude the implied warranty of habitability absent 'particular' language which is designed to put the buyer on notice of the rights he is waiving. There is nothing particular about the contract language involved in this case. Indeed, it makes no reference at all to the warranty of 'habitability,' referring only to the warranties of merchantability and fitness for a particular purpose.").

workmanship were properly limited and, as a consequence, had expired. As such, we discern no error on these grounds.

Ninth, Cutler claims that "[t]he trial court erred by refusing to grant a new trial because the jury's verdict under the breach of implied warranty of habitability and implied warranty of workmanlike construction claims was against the weight of the evidence presented at trial[.]" Cutler's Brief (Second Appeal) at 21 (unnecessary capitalization and emphasis omitted). Cutler states that the verdict was against the weight of the evidence for the same reasons discussed above: Appellees resided in the home full time since making settlement, and "[n]o terms extended any part of the Implied Warranties beyond the agreed upon one year provision within the Express Warranty…." *Id.* at 23. Again, for the reasons stated above, we do not conclude that the verdict is so contrary to the evidence as to shock one's sense of justice, *see Alwine*, 883 A.2d at 611, as the extensive water infiltration made Appellees' house uninhabitable and the implied warranties had not expired.

Tenth, Cutler claims that the trial court "erred in finding that [Cutler] violated the [UTPCPL] by breaching the express warranty[.]" Cutler's Brief (Second Appeal) at 27 (unnecessary capitalization and emphasis omitted).[20]

_____

[20] Once again, "[w]hen reviewing the sufficiency of the evidence, this Court must determine whether the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the verdict winner, was
*(Footnote Continued Next Page)*

Cutler explains that, following the two-day bench trial on Appellees' claims for violations of the UTPCPL, the trial court "found that [Cutler] breached the UTPCPL by failing to honor the written Warranty." **Id.** (citation omitted). According to Cutler, the trial court erred in this finding because "the Express Warranty on which the Claims were based had expired at least two years before Appellees had any alleged issues." **Id.** It reiterates that "[n]o alleged issues presented until 2005, over three years after … Appellees purchased their home. The Express Warranty clearly and unambiguously limits the warranties made within to one (1) year." **Id.** at 31 (citations omitted). For the reasons already addressed above, we deem that this argument is meritless, as Paragraph 3(a) of the Warranty was not limited in time.

Eleventh, Cutler argues that the trial court committed an error of law and abused its discretion in refusing to dismiss Appellees' claims under the UTPCPL because their claim was barred under the statute of limitations. **See** Cutler's Brief (Second Appeal) at 5, 27-29. Cutler maintains that the statute of limitations on a claim under the UTPCPL is six years, which Appellees do not dispute. **See id.** at 27-28; Appellees' Brief (Second Appeal) at 37-38. The issue, therefore, is when the six-year statute of limitations began to run.

_(Footnote Continued)_ ———————————

sufficient to enable the factfinder to find against the losing party." **Bannar**, 701 A.2d at 238 (citation omitted).

Without offering any specific authority in support, Cutler claims that "the Statute of Limitations began to run at the time that [Appellees] allegedly sustained the required 'ascertainable loss' under the UTPCPL." Cutler's Brief (Second Appeal) at 28. Consequently, Cutler advances that "the date of the settlement on [Appellees'] home, October 1, 2002[,] was the date that the Statute of Limitations began to run. Furthermore, the [trial court] held that the breach occurred in 2002 when [Cutler] presented Appellees with the warranty and warranted that the home was built in accordance with accepted home building practices[,]" which the trial court found to be "false." *Id.* at 28-29. Because Appellees did not commence this action until March 1, 2012, Cutler says that their claims are barred. *Id.* at 29. Moreover, Cutler states that "even if we assume, *en arguendo*, that the Statute of Limitations did not begin to run until [Appellees] first noticed an issue with water leaking, which was May 5, 2005, Appellees' claim under the UTPCPL would still be time barred." *Id.* Again, we disagree.

Under the UTPCPL, "unfair or deceptive acts or practices" include the following, which are also at issue in this case:

> (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;
>
> …
>
> (xiv) Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;
>
> …

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 P.S. § 201-2(4)(vii), (xiv), (xxi). As the trial court recognized, "[a]ny failure by [Cutler] to honor its written warranty by necessity occurred after the settlement date. It is the *failure* to honor the warranty, not necessarily the issuance of the warranty that triggers liability and generates a UTPCPL claim." TCD at 13 (emphasis in original). Thus, the trial court explained that "[i]t wasn't until [Appellees] and Cutler learned of the water infiltration caused by the construction failures, [Cutler] failed to search for and solve the problem[,] and refused to abide by its warranty that the violation occurred and the claim arose. Those events occurred no earlier than 2010." *Id.* at 13-14. Accordingly, we concur with the trial court that Appellees' claims are not barred by the statute of limitations.

Twelfth, Cutler contends that the trial court committed an error of law and abused its discretion "in finding that [Cutler] violated the [UTPCPL] when [Appellees] should not have been permitted to show reliance outside of the agreement of sale under the parol[] evidence rule[.]" *See* Cutler's Brief (Second Appeal) at 5, 30-31 (unnecessary emphasis and capitalization omitted). It states that "[t]he parol[] evidence rule functions in Pennsylvania to bar the introduction of evidence concerning alleged prior misrepresentations when a writing is adopted by the parties as the final and complete expression of their agreement." *Id.* at 30. Therefore, Cutler claims that "[t]he integration clause … precludes Appellees from

demonstrating the requisite element of reliance necessary to sustain a cause of action for violation of the UTPCPL." **Id.** Additionally, Cutler says that "Appellees['] allegations and testimony that [Cutler] violated the UTPCPL by making any representations outside of the Agreement of Sale cannot prove said claim." **Id.**

We recognize that a plaintiff must show, *inter alia*, justifiable reliance on the defendant's wrongful conduct to bring a private cause of action under the UTPCPL. **See Yocca v. Pittsburgh Steelers Sports, Inc.**, 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance.") (citations omitted); **Kern v. Lehigh Valley Hosp., Inc.**, 108 A.3d 1281, 1289-90 (Pa. Super. 2015) ("[J]ustifiable reliance is an element of private actions under Section 201–9.2 of the UTPCPL. As such, [the a]ppellant had to demonstrate that he … justifiably relied on [the a]ppellee's alleged violations of the UTPCPL and, as a result of those alleged violations, suffered an ascertainable loss."). Nevertheless, we believe that Cutler's argument invoking the parol evidence rule is misplaced.

Our Supreme Court has previously described the parol evidence rule as follows:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. **All preliminary negotiations, conversations and verbal agreements**

> ***are merged in and superseded by the subsequent written contract*** ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

> Therefore, for the parol evidence rule to apply, there must be a writing that represents the "entire contract between the parties." To determine whether or not a writing is the parties' entire contract, the writing must be looked at and "if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties...." An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution.

> ***Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract.*** One exception to this general rule is that parol evidence may be introduced to vary a writing meant to be the parties' entire contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake. In addition, where a term in the parties' contract is ambiguous, "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances."

*Yocca*, 854 A.2d at 436-37 (internal citations, brackets in original, and footnote omitted; emphasis added).

In the case *sub judice*, the trial court rejected Cutler's argument because — as our Supreme Court discussed in ***Yocca*** — the parol evidence

rule applies only to *previous* negotiations, conversations and verbal

agreements. It opined:

> [Cutler] … argues that the integration clause in [Appellees']
> Agreement of Sale prevents [Appellees] from establishing
> justifiable reliance required for a successful UTPCPL [claim]
> because they cannot rely on any representations made by
> [Cutler] before execution of the Agreement of Sale. Although
> that may be true, this princip[le] is not applicable to [Appellees']
> UTPCPL claims. The UTPCPL violations committed by [Cutler] as
> alleged by [Appellees] arose at various times at or following
> settlement on their home. It is this distinction that [Cutler's]
> argument regarding the parol evidence rule overlooks.
>
> [Appellees] are not relying on oral representations or statements
> made before or at the time of the Agreement of Sale or in
> promotional materials or the like. Rather, they are asserting a
> claim based upon a written warranty that was expressly
> referenced in the Agreement of Sale, executed by [Appellees]
> and presented to them thereafter. [Appellees] justifiably relied
> on Cutler's written representations and warranties that their
> home had been built according to applicable standards and
> properly inspected prior to settlement. It had not been so
> constructed when [Appellees] executed the written Warranty on
> October 1, 2002[,] and Cutler knew it. [Appellee] Krishnan
> testified that the warranty was important to him as was the
> building of a quality, well-constructed home. It was clear to the
> court from the testimony of [Appellees], which it found credible,
> that they relied upon Cutler's assurances that it would honor its
> warranty, investigate their reported problems, solve the water
> problem[,] and repair their home to bring it in accordance with
> the Warranty. This proved not to be the case. Rather than
> investigate the source of [Appellees'] water infiltration, [Cutler]
> simply engaged in a superficial "repair" of [Appellees'] windows.
>
> All of this conduct engaged in by Cutler resulted in water
> damage to [Appellees'] home and later an exacerbation of that
> problem when Cutler undertook a series of so-called repairs that
> it knew would be futile in preventing additional water infiltration.
> Although Cutler presented the court with expert testimony on its
> behalf, the court found more credible the testimony of
> [Appellees'] expert Mr. Lukowski. He testified that the cause of

the water intrusion, included among other things, the non-compliant thin stucco applied to [Appellees'] Home. [Appellees] have demonstrated to the court's satisfaction the reliance and causal connection necessary to recover on their UTPCPL claims.

TCD at 21-22 (internal citation omitted). As such, because Appellees' claims are based on a written warranty clearly referenced in the sale agreement and presented to them thereafter — as well as on Cutler's failure to honor the warranty following settlement — we likewise conclude that the parol evidence rule did not bar Appellees from demonstrating reliance in this case.

Thirteenth, Cutler alleges that "[t]he lower court erred in finding that [Appellees] proved justifiable reliance sufficient to show a violation of the [UTPCPL.]" Cutler's Brief (Second Appeal) at 32 (unnecessary capitalization and emphasis omitted). As addressed above, "[t]o bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *See Yocca*, 854 A.2d at 438. Here, Cutler alleges that "Appellees did not prove that they justifiably relied upon the Warranty, either in making the purchase or while [Cutler] was performing work on the house after the water infiltration began." Cutler's Brief (Second Appeal) at 35. Specifically, it argues:

In the matter at hand[,] the [l]ower [c]ourt found that … Appellees justifiably relied upon [Cutler's] actionable conduct. However, [Appellee] Krishnan testified only that it was important to him that the home was built by a builder who was standing behind his work and that warranty was important to them. Although [Appellee] Krishnan does not recall when he received the Warranty, or when he first read it, he believes it was part of a pre-settlement packet.

- 53 -

Significantly[,] Appellees contend[,] and the [l]ower [c]ourt found[,] that [Cutler] made representations in the warranty. [] Appellees signed the sale [agreement] on August 24, 2002. However, Appellee [Krishnan] clearly testified that he did not recall receiving the warranty, and that it may have been in a pre[-]settlement packet. Accordingly[,] Appellees could not have read the warranty prior to purchasing the home, and therefore they could not have relied on any representations contained therein.

He also stated that he **assumed**, that [Cutler] was making the early repairs under the warranty. There is no testimony or evidence that the repairs or alleged representations made regarding repairs were done under or through the written Warranty. More importantly[,] Appellees did not present any evidence that [Cutler] made representations that the work was being done under the warranty or that it was covered by the warranty. Therefore, there is no evidence that … Appellees had a justifiable belief that the repairs were being made under the written warranty. They merely **assumed** it was such. No representations were made by [Cutler] or any employee thereof that the repairs were being made under the warranty and therefore … Appellees could not have relied on any such representations. An assumption is not proof, and there was no evidence presented that any representations were made which would lead … Appellees to believe the work was being done pursuant to the written [w]arranty.

*Id.* at 33-34 (internal citations omitted; emphasis in original).

Our review of the trial transcript reveals that Appellee Krishnan testified to the following:

[Appellees' Attorney:] Okay. I'm going to turn your attention to Exhibit 9 in the binder. Can you identify this document?

[Appellee Krishnan:] Yes. So this appears – this seems to be the Homeowner Guide to Warranties and Maintenance. …

[Appellees' Attorney:] So this is just the Homeowners Guide to Warranties and Maintenance, before the actual signed warranty, correct?

[Appellee Krishnan:] Yes.

[Appellees' Attorney:] Just turning your attention to Page 2 in your binder, did you have an opportunity to read this prior to closing?

[Appellee Krishnan:] Yes.

[Appellees' Attorney:] And you considered all the things that were in here before moving forward with the transaction, correct?

[Appellee Krishnan:] Yes, we did.

[Appellees' Attorney:] Okay. Just turning your attention to that second paragraph right there where it says, "Your home has been constructed by skilled tradesmen using both modern methods and materials"; do you see that?

[Appellee Krishnan:] Yes, I do.

[Appellees' Attorney:] And it says, "However, no matter how careful we try to be, when dealing with the human element, there are bound to be some oversights"; do you see that, correct?

[Appellee Krishnan:] Yes. …

[Appellees' Attorney:] What is it that you understood to be represented to you when you read this document?

[Appellee Krishnan:] That … Cutler has skilled people and experienced people who are building the house, and that there might be some issues, but mostly caused by human error.

[Appellees' Attorney:] Turning now to the next exhibit in your binder, which would be [Appellees'] Exhibit 10. Could you identify this document for the jury?

[Appellee Krishnan:] Yes. This is labeled as the Home Warranty Agreement – Limited Warranty, Home Warranty Agreement.

[Appellees' Attorney:] And this was given to you as part tof [*sic*] that homeowners and maintenance package that I just showed you in [Appellees'] Exhibit 9, correct?

[Appellee Krishnan:] Yes.

[Appellees' Attorney:] So the two of them together really should be just one document that you received at the same time?

[Appellee Krishnan:] Yes.

[Appellees' Attorney:] And you received this prior to settlement?

[Appellee Krishnan:] Yes.

[Appellees' Attorney:] And you reviewed this document prior to settlement?

[Appellee Krishnan:] Yes.

[Appellees' Attorney:] Is that your signature in the middle of the page --

[Appellee Krishnan:] Yes.

[Appellees' Attorney:] – on the right-hand side writ [*sic*] says purchasers?

[Appellee Krishnan:] Correct.

[Appellees' Attorney:] Okay.  And what you did [*sic*] understand this document was doing when you looked at it?

[Appellee Krishnan:] This was giving specifics of the warranty that's there, and really that it's part of the sale for the house.  …

[Appellees' Attorney:] Referring to Paragraph 3, "In addition, seller specifically warrants as follows, but not in limitation of the general warranty stated above: (a), Your home has been constructed in accordance with the accepted home building practice of this locality and prior to delivery has been inspected by our trained personnel as well as the building inspector," do you see that?

[Appellee Krishnan:] Yes, I see that.

[Appellees' Attorney:] ***And what is it that you understood Cutler was guaranteeing in that portion?***

[Appellee Krishnan:] ***That they would build a quality home, that they are following the building norms that are there, they are following the building codes, and they are doing what they have to do.***

[Appellees' Attorney:] ***Did you rely upon these representations in this warranty before purchasing your home?***

[Appellee Krishnan:] ***Yes. We really wanted to buy from a builder who was standing behind his work, and I think this is what we expected, and the fact that we had such a warranty was important to us in making the decision to buy the house.***

N.T. Jury Trial, 12/7/2015, at 61-66 (emphasis added). Furthermore, with respect to Cutler's response to the water infiltration in Appellees' home, Appellee Krishnan testified:

[Appellees' Attorney:] What action did you take – what, if any, action did you take as a result of experiencing the water infiltration in 2006?

[Appellee Krishnan:] We called up the service department of Cutler and they sent somebody to repair the issues. …

[Appellees' Attorney:] Do you have any understanding as to what Cutler did when they were there?

[Appellee Krishnan:] We didn't, again, receive something that was in writing, but ***we were left with the assurance that they had come in and fixed everything.***

[Appellees' Attorney:] Okay. Now, in 2005 and 2006, both times after Cutler sent its service technicians to perform their work, did you perform any individual inspections on your own?

[Appellee Krishnan:] ***No, no, because we relied on Cutler's competence and they had their people to come in and fix it***…. They have built houses, 6,000 houses, they have been building houses for many, many years, and so my assumption was that they knew what they were doing and when they will come in and fix something, then it was fixed.

\*\*\*

[Appellees' Attorney:] And what, if anything, did you do in response to observing this leaking in 2010?

[Appellee Krishnan:] So we did the usual step of calling Mr. Cutler's service defendant [*sic*].

[Appellees' Attorney:] And what was the response that you received?

[Appellee Krishnan:] This time we are told that it was not their problem, that they – actually, I think they spoke to my wife and said contact the roofing company.

[Appellees' Attorney:] Did they indicate – let me take you back for a moment. ***When they performed their repairs in 2005 and 2006, did they charge you anything for that?***

[Appellee Krishnan:] ***No***.

[Appellees' Attorney:] ***Did they indicate whether that was under the warranty service?***

[Appellee Krishnan:] ***That is what we assumed, and that's why we always called them, because that was the house that they built.***

\*\*\*

[Appellees' Attorney:] Okay. And I believe you testified yesterday that in 2005 and 2006 Cutler came to repair the house?

[Appellee Krishnan:] Correct.

[Appellees' Attorney:] ***And that you relied upon those repairs?***

[Appellee Krishnan:] ***Exactly, exactly. Because we had the problems and then Cutler's service department came and repaired it, and we were led to believe that they had fixed the problems of the leak***.

[Appellees' Attorney:] ***When did Cutler tell you that your home was out of warranty and that they wouldn't be making any repairs?***

[Appellee Krishnan:] ***I think the first time they mentioned that was in February, March of 2010, when we called them. And that's when they gave us the name of the***

> ***roofing company and said you should go and talk to them,
> but that there was no more warranty on the house.***
>
> [Appellees' Attorney:] And did Mr. McCarty come to your house
> after that on behalf of Cutler?
>
> [Appellee Krishnan:] Correct, they [*sic*] did.
>
> [Appellees' Attorney:] And did Mr. Adams – or I should say, did
> the representative from Tom Adams come to your house after
> that conversation?
>
> [Appellee Krishnan:] Correct.
>
> [Appellees' Attorney:] ***And, again, as Mr. Pancio had asked
> in his cross-examination, you didn't pay for any of those
> visits, correct?***
>
> [Appellee Krishnan:] ***Correct, we didn't pay anything.***

N.T. Jury Trial, 12/7/2015, at 70, 71-72; N.T. Jury Trial, 12/8/2015, at 24-

25 (emphasis added).

Based on the above testimony, and viewing the evidence in light most

favorable to Appellees as the verdict winner, we consider the evidence

sufficient to support the trial court's findings that Appellees justifiably relied

on the Warranty in purchasing the home and seeking remediation from

Cutler. ***See Bannar***, 701 A.2d at 238 (citation omitted). With respect to

the home purchase, Appellee Krishnan clearly testified that he reviewed the

Warranty before settlement, and he valued that he was buying a quality

home by which Cutler would stand.[21] Moreover, the evidence supports the

---

[21] Appellees also point out that "the [sale] Agreement, which [Appellees]
signed before receiving the Warranty, allow[ed] [them] to terminate the sale
*(Footnote Continued Next Page)*

trial court's finding that Appellees justifiably relied upon Cutler's assurances to remediate their home pursuant to the warranty. **See** TCD at 22. As Appellees persuasively remark:

> [] Cutler's argument that the trial court erred in finding that [Appellees] proved justifiable reliance because [Appellee] Krishnan only "assumed" that Cutler was making repairs under the Warranty is nonsensical. Cutler repeatedly made purported "repairs" to the Home, free of charge, and also repeatedly assured [Appellees] that Cutler corrected the water infiltration issue. In fact, [Appellees] communicated directly with Cutler's Service Department and, in particular, Cutler's Warranty Manager … regarding the "repairs." In any event, it was not until February 2010, nearly five years after Cutler performed the first set of "repairs," that Cutler refused to perform "repairs," telling [Appellees] that it would no longer do so solely because the Warranty had purportedly expired.

Appellees' Brief (Second Appeal) at 41-42 (internal citations omitted). We deem the evidence and *all reasonable inferences therefrom*, when viewed in the light most favorable to Appellees, sufficient to enable the trial court to find that Appellees justifiably thought that Cutler was repairing the house pursuant to the warranty. **See Bannar**, 701 A.2d at 238 (citation omitted). Accordingly, we see no error in the trial court's findings regarding justifiable reliance on these grounds.

Fourteenth and fifteenth, Cutler alleges that "the trial court erred in finding that [Cutler] violated the [UTPCPL] because Appellees did not prove

*(Footnote Continued)* ———————————————

prior to settlement." Appellees' Brief (Second Appeal) at 41 (citation omitted).

fraud by clear and convincing evidence[,]" and that Appellees were required "to establish the common law elements of fraud in order to support their claims under the [UTPCPL.]" Cutler's Brief (Second Appeal) at 5, 35 (emphasis and unnecessary capitalization omitted).[22,23] Cutler states that "[t]he Superior Court of Pennsylvania has held that plaintiffs are required to prove the elements of common law fraud in order to sustain a claim under the provisions of the UTPCPL[,]" and argues that Appellees "failed to introduce any evidence to support a finding of common law fraud sufficient to show [Cutler] violated the UTPCPL." *Id.* at 35, 36 (citing ***Ross v. Foremost Ins. Co.***, 998 A.2d 648, 654 (Pa. Super. 2010)).[24,25] We believe this is a misstatement of the law.

---

[22] We consider these issues together because Cutler briefed them as a single issue. ***See*** Cutler's Brief (Second Appeal) at 35-39.

[23] We note that these issues "involve statutory interpretation, raise a question of law, and are subject to *de novo* and plenary review." ***Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC***, 40 A.3d 145, 151 (Pa. Super. 2012) (citation omitted).

[24] This Court has noted that:

> To state a claim for common law fraud, the plaintiff must show: (1) a representation; (2) material to the transaction at issue; (3) made falsely, with either knowledge or reckless disregard of its falsity; (4) with the intent to misleading another person or inducing justifiable reliance; and (5) an injury caused by the reliance.

***Bennett***, 40 A.3d at 152 n.5 (citation omitted).

Cutler advances its position as follows:

[I]n **Fazio v. Guardian Life Ins. Co. of Am[erica]**, … 62 A.3d 396 (Pa. Super. 2012), the Superior Court … held that plaintiffs are required to prove the common law elements of fraud to support their UTPCPL claim or **alternatively**, deceptive conduct for purposes of stating a catchall UTPCPL claim under the 1996 amendments. **Id.** Therefore, the Court has stated that plaintiffs must prove either deceptive conduct under the catchall provision or prove all of the elements of common law fraud under any other provision. As the Court has acknowledged, the UTPCPL is **based in fraud**, and the Catchall provision was amended to include the term "deceptive." According to **Fazio**, **supra**, it follows that the lower burden of deceptive conduct does not extend to the other provision of the UTPCPL. **Id.** Logically, if a violation of a warranty, in and of itself, without the proof of fraud, is a violation of the UTPCPL all warranties which are violated could be also brought under the statute. This cannot be the purpose of the legislature.

Cutler's Brief (Second Appeal) at 37-38 (some emphasis in original).

To begin, we note that the **Fazio** Court was considering whether the appellants in that case had a right to a jury trial on their UTPCPL claims. **Fazio**, 62 A.3d at 400. The appellants argued, among other things, that "even if the UTPCPL does not provide for a jury trial, claims under the UTPCPL are grounded in common law fraud[,]" and "[b]ecause fraud was a cause of action that existed at the time the Pennsylvania Constitution was adopted, … they were entitled to a jury trial." **Id.** at 402. In support of this argument, the appellants relied on **Toy v. Metropolitan Life**, 928 A.2d 186

*(Footnote Continued)* ───────────────

[25] As discussed further, *infra*, this Court has previously stated that **Ross** is "not binding to the extent [it] purport[s] to interpret the post-amendment catchall provision of the UTPCPL." **Bennett**, 40 A.3d at 155.

(Pa. 2007), "for the proposition that UTPCPL claims are solely grounded in common law fraud." *Id.* at 409. Relying on **Toy**, the **Fazio** Court commented, in *dicta*, that the appellants "were required to prove the common law elements of fraud to support their UTPCPL claim (or alternatively, deceptive conduct for purposes of stating a catchall UTPCPL claim under the 1996 amendments)…." *Id.* at 409-10.

Our Supreme Court's decision in **Toy**, however, merely held that "a plaintiff alleging violations of the Consumer Protection Law must prove *the common law fraud element of justifiable reliance*[,]" not *all* of the elements of common law fraud. **Toy**, 928 A.2d at 208 (emphasis added). In addition, the **Fazio** Court ultimately concluded that the UTPCPL "did not merely codify common law claims of fraud. The UTPCPL created a distinct cause of action for consumer protection. While a plaintiff is required to prove **elements** of common law fraud to support **certain** UTPCPL claims, he/or she would still have to prove the elements of a consumer-based transaction or relationship." *Id.* at 411.

Moreover, as mentioned, *supra*, Appellees assert that Cutler violated the UTPCPL under subsections 201-2(4)(vii) ("Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another"); 201-2(4)(xiv) ("Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is

made); and 201-2(4)(xxi) ("Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding"), which is also referred to as the "catchall" provision. This Court has established that a plaintiff does not need to prove common law fraud to state a claim under the current catchall provision. *See Bennett*, 40 A.3d at 154 ("A contrary reading that adheres to the common law fraud requirement for cases arising under the post-amendment catchall provision ignores the textual changes of the 1996 amendment as well as the rules of statutory construction."). Furthermore, Cutler has not cited any appellate authority to support that subsections 201-2(4)(vii) and 201-2(4)(xiv) require Appellees to prove each of the elements of common law fraud.

> Finally, we find compelling the trial court's observation that:

> The UTPCPL defines the failure to comply with a written warranty as an "unfair method of competition" and "unfair or deceptive act or practice." It is not defined as fraudulent conduct. Although Pennsylvania courts require that the traditional elements of common law fraud — justifiable reliance and causation — be components of every UTPCPL claim, the requirement comes not from the fact that every enumerated act is based in "fraud." Rather, the requirement stems from the language of the statute itself.

> As explained by the Superior Court in *Kern v. Lehigh Valley Hosp.*, 108 A.3d 1281 (Pa. Super. 2015), the "belief the element of justifiable reliance only is a product of fraudulent conduct" is incorrect. Rather,

> > the element of justifiable reliance under the UTPCPL is the product of both (a) the Legislature's intent not to do away with traditional elements of reliance and causation under the UTPCPL, and (b) the express provision under 201-9.2 that requires a private action plaintiff to prove an

- 64 -

> "ascertainable loss … *as a result of* the use of employment by any person of a method, act or practice declared unlawful" under Section 201-3 of the UTPCPL. 73 P.S. § 201-9.2(a) (emphasis added). *The element of justifiable reliance always was a part of private actions under the statutory language of the UTPCPL.*
>
> *Id.* at 1289-90.

TCD at 21 (some emphasis added). Based on the foregoing reasons, the trial court did not commit an error of law in determining that Appellees were not required to prove all of the elements of common law fraud to support their UTPCPL claims.

Sixteenth, Cutler purports that "the trial court erred in finding that [Cutler] had engaged in a practice of deceptive conduct in violation of the [UTPCPL.]" Cutler's Brief (Second Appeal) at 39. It states that Appellees "have not proven that [Cutler's] actions were deceptive, only that there were issues present in the home in question. There is no evidence that [Cutler] in fact knew that the home was not built in accordance to applicable standards, and that the repairs would not work." *Id.* at 40. Cutler explains that it was "under the belief that the home was inspected by the subcontractors and that all codes were followed in their individual tasks." *Id.*

At the outset, it is unclear to us whether Cutler challenges the sufficiency of the evidence or the weight of the evidence underlying the trial court's finding that its conduct was deceptive. In its statement of the issues, Cutler frames the question as, "Did the trial court commit an error of law and abuse its discretion in finding that [Cutler] had engaged in a practice of

deceptive conduct in violation of the [UTPCPL] when the **weight of the evidence** did not support such a finding?" **Id.** at 6 (unnecessary emphasis and capitalization omitted). Yet, in the argument section of its brief addressing this issue, Cutler does not develop a weight of the evidence argument, but rather seems to present a sufficiency argument. **See, e.g.**, **id.** at 40. Thus, we find this issue is waived. **See Lackner**, 892 A.2d at 29-30 ("[A]rguments which are not appropriately developed are waived.") (citations omitted).

Nevertheless, even if properly developed, we would still consider Cutler's challenges to the sufficiency and weight of the evidence here to be meritless. The trial court explained why it found that Cutler's representations regarding the quality of the home were deceptive:

> [Appellees] allege that [Cutler] **warranted** in October, 2002 that:
>
> - [Appellees'] home was constructed "in accordance with the accepted home building practice of this locality"[]; and
>
> - Prior to delivery, [Appellees'] Home was inspected by trained personnel.[26]
>
> The court finds that when [Cutler] made such representations[,] the statements were false. At trial, [Appellees'] expert, John Lukowski, testified credibly that the applicable building code in effect at the time of construction required a minimum three-coat application of stucco and 7/8 inch thickness. [Cutler's] expert conceded that the 1/2 inch stucco placed on [Appellees'] Home

---

[26] This is the language set forth in Paragraph 3(a), *supra.*

- 66 -

did not meet the requirements of the building code then in effect.

Cutler's project supervisor and "quality control manager," Justin McCarty, who supervised the construction of [Appellees'] Home, admitted during his testimony that he had little knowledge in 2002 concerning the proper application of stucco and that he did not know what constituted correct versus incorrect practice. In its closing arguments, in an apparent effort to distance itself from this testimony, [Cutler] suggests that the court should disregard Mr. McCarty's concession regarding his lack of knowledge of applicable stucco standards because Cutler utilized a stucco subcontractor to construct the Home.

The court disagrees that Mr. McCarty's testimony is not significant or worthy of its consideration. Any issue that Cutler may have with the quality of the work performed by one of its sub-contractors is between those entities and does not affect what [Appellees] were guaranteed — a home built in accordance with applicable building standards. Cutler knew it was not in a position to make that guarantee or later to honor it for that matter if it had no knowledge of or understanding regarding those standards. Without that knowledge, it could not ensure that its agents acted in accordance therewith.

Similarly, Cutler knew it was not in a position to promise an inspection by its "trained personnel" if in fact they had no such personnel. Mr. McCarty testified at both phases of the trial that neither he nor anyone else at Cutler performed inspections at the Home to ensure that windows, flashing components, or stucco were installed correctly. As the trial evidence demonstrated, any inspection by Cutler's team was not by "trained" professionals given Mr. McCarty's concessions that as the lead construction supervisor onsite, he had no knowledge regarding how to properly construct a home with a stucco façade.

Finally, the fact that East Whiteland Township issued a Certificate of Occupancy for the Home following its inspections, upon which [Cutler] relies heavily in its defense, does not change or diminish the above evidence. It simply indicates to the court that East Whiteland Township did not uncover the code violations, not that the violations did not exist in the first place.

TCD at 14-16 (emphasis in original; internal citations omitted).

Further, the trial court discussed, at length, why it determined that Cutler knew its subsequent repairs would not work based on the evidence at trial. *See id.* at 16-19. The trial court found, *inter alia*, that Cutler repeatedly cleaned, caulked, and sealed around windows despite knowing that similar, previous efforts were ineffective; failed to perform any additional investigation to determine the cause or extent of the water infiltration; and neglected to follow through with scheduling repair work. *Id.* In sum, the trial court explained:

> The above history demonstrates that although Cutler may have attempted the first time to honor its written warranty to [Appellees], very soon thereafter it was clear to Cutler that [Appellees'] water problems were caused by more than just a defective window and would not be cured with "sealing." Although it may be true, as [Cutler] argue[s], that repairs to a home are not a guaranteed science, it is also true that [Cutler] guaranteed and warranted a home built in accordance with a certain standard and when presented with evidence of problems at [Appellees'] Home[,] it failed to determine if that in fact was the case. Moreover, once notified of the problems, rather than comply with the terms of the warranty it issued to [Appellees], Cutler engaged in a series of ineffective, superficial remedies which failed to provide [Appellees] with the Home they were promised – one constructed in accordance with accepted home building practices in the locality. This refusal to honor its warranty violated the UTPCPL.

*Id.* at 19-20. Given the ample evidence presented at trial, we would discern that the trial court did not err in concluding that Cutler's conduct was deceptive.

Seventeenth, Cutler advances that the trial court "erred in refusing to grant a mistrial when [Appellees] submitted new evidence, ex parte, after the conclusion of the trial[.]"  Cutler's Brief (Second Appeal) at 45 (unnecessary emphasis and capitalization omitted).  Specifically, Cutler avers that after the close of evidence in the bench trial on the UTPCPL claims, "Appellees' Counsel submitted his Findings of Fact/Conclusions of Law and attached additional documents marked as Exhibit A and Exhibit B that were not introduced into evidence during the trial."  *Id.* at 45-46 (citation and emphasis omitted).  Cutler states that the trial court should have granted a new trial as a result.[27]

We deem this issue waived as Cutler fails to proffer any authority in support of its argument.  We reiterate that "arguments which are not appropriately developed are waived[,]" and "[a]rguments not appropriately developed include those where the party has failed to cite any authority in support of a contention."  *See Lackner*, 892 A.2d at 29-30 (citations omitted).

---

[27] "Our standard for reviewing a trial court's denial of a mistrial is abuse of discretion."  *Stapas v. Giant Eagle, Inc.*, 153 A.3d 353, 367 (Pa. Super. 2016) (citation omitted).  *See also Commonwealth v. Lease*, 703 A.2d 506, 508 (Pa. Super. 1997) ("[T]he remedy of a mistrial is an extreme one.... It is primarily within the trial court's discretion to determine whether [the a]ppellant was prejudiced by the event that forms the substance of the motion.  Finally, it must be remembered that a mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial.") (citation omitted).

In any event though, it would be unclear to us how the evidence at issue even affected Cutler, let alone prejudiced it. In its order striking Exhibits A and B attached to Appellees' Amended Proposed Findings of Fact and Conclusions of Law and denying Cutler's request for a mistrial, the trial court commented:

> This matter was fully and effectively litigated by the parties over the course of five trial days (three days – jury trial; two days – bench trial). The court does not see the need for the introduction of new evidence, whether recently discovered or otherwise, in order to properly decide [Appellees'] UTPCPL claim. Moreover, the court has not been, and will not be, influenced by the new documents attached as exhibits to [Appellees'] post-trial submissions. Concerns about confusion of the issues, prejudice and so forth are not present here. The court, having been responsible for this action for years, is well aware of [Appellees'] claims and arguments regarding water problems in "other" homes built by [Cutler] and the significance thereof. Likewise, it is intimately familiar with [Cutler's] responses and defenses to these claims. The court does not see the need to re-visit the issue yet again.

Trial Court Order, dated 2/3/2016, at 1 n.1 (single page). Thus, we would conclude that the trial court did not abuse its discretion in denying Cutler's request for a mistrial, as Cutler does not demonstrate prejudice.

Eighteenth, Cutler alleges that the trial court "committed an error of law and abuse of discretion in allowing evidence of water damage in other homes[.]" Cutler's Brief (Second Appeal) at 48 (unnecessary capitalization

and emphasis omitted).[28]  Cutler argues that "[t]he UTPCPL issues in this case revolve around the sale of [Appellees'] home.  The UTPCPL makes it clear that private causes of action stem from the transaction in question."  *Id.*  Thus, according to Cutler, "[a]lleged water infiltration in, or repairs to, other homes that arose many years after the sale of Appellees' home could have no probative value to the issue of whether the UTPCPL was violated in this case."  *Id.* at 49.  Cutler claims it was prejudiced by the introduction of such evidence and the trial court erred in denying its motion for post-trial relief on this basis.  *Id.* at 50.

Conversely, in its July 12, 2016 order denying Cutler's post-trial motion, the trial court explained:

> In addressing [Cutler's] pre-trial challenge to the introduction of evidence of "other water damage," the court in its Order dated January 6, 2016, wrote:
>
>> This disputed evidence is also relevant to the issue of damages under the UTPCPL.  The manner in which [Cutler] may or may not have deceived or misled [Appellees] will be relevant if the court finds liability on the part of [Cutler].  Although the Supreme Court has rejected the use of a punitive damages standard to determine whether treble damages are warranted, it has recognized that

---

[28] "When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law."  ***Reott v. Asia Trend, Inc.***, 7 A.3d 830, 839 (Pa. Super. 2010) (citation omitted).  Further, "for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.  A party suffers prejudice when the trial court's error could have affected the verdict." *Id.* (citations omitted).

> "courts of original jurisdiction should focus on the presence of intentional or reckless, wrongful conduct, as to which an award of treble damages would be consistent with and in furtherance of the remedial purposes of the UTPCPL." ***Schwartz v. Rockey***, … 932 A.2d 885 ([Pa.] 2007).
>
> As for [Cutler's] claim that the evidence would be unduly prejudicial, the court disagrees. This claim will be heard by the court sitting non-jury. Concerns about confusion of the issues, prejudice and so forth are not present here. The court as the fact-finder will be able to hear the evidence presented and will be able to weigh its probative value and properly consider it only for the purpose for which it is relevant and presented. ***See*** Pa.R.E. 403.

(Order, 1/6/16 at fn. 1)

[Cutler's] argument post-trial is the same as that it previously advanced and the court rejected.

Furthermore, although evidence of "other water damage" was discussed during the non-jury portion of the case, the court did not rely on such testimony in finding liability on the part of [Cutler]. In fact, in choosing ***not*** to award [Appellees] treble damages (that aspect of the case where such evidence could arguably be relevant) the court stated:

> Although [Cutler] failed to construct [Appellees'] home as warranted and failed to determine the source of [Appellees'] water infiltration as required and warranted, the court is concerned with what happened to these [Appellees] and their Home. It rejects [Appellees'] suggestion that what may have occurred with other homeowners justifies a recovery by them in form of treble damages.

([TCD], at 32).

[Cutler] clearly was not harmed by any error in allowing such testimony.

Trial Court Order Denying Cutler's Post-Trial Motion, 7/12/2016, at 1 n.1

(emphasis in original).

In light of the trial court's explanation, it is apparent that it did not consider alleged water damage in other homes when finding Cutler to be liable under the UTPCPL. Instead, the trial court found such testimony relevant with respect to determining whether it should award treble damages to Appellees, which Cutler totally ignores in its brief. Further, we fail to see how Cutler has suffered any prejudice, as it does not show how the evidence in any way affected the verdict. Accordingly, Cutler has not convinced us that the trial court abused its discretion in allowing evidence of water damage in other homes to be admitted at trial.

Last, in its nineteenth issue, Cutler maintains that the trial court "erred in allowing William Wheatley to provide expert testimony when he was called as a fact witness and when he was not identified before trial[.]" Cutler's Brief (Second Appeal) at 51 (unnecessary emphasis and capitalization omitted). Cutler claims "[Mr.] Wheatley was never entered as or qualified as an expert…. He therefore should not have been permitted to testify as an expert witness, and opine on the construction and testing on other homes built by [Cutler]." *Id.* at 52. Further, it avers that "Mr. Wheatley admitted that he had not inspected Appellees' home and therefore, the testimony could have no probative value." *Id.*

In spite of Cutler's assertions, the trial court insists that Mr. Wheatley provided no expert opinion about the cause of the water infiltration. It clarified:

> [Cutler] contends that the court erred in allowing William Wheatley to provide expert testimony at trial when he was called as a fact witness and never qualified as an expert. In the non-jury trial, Mr. Wheatley testified about an encounter with Mr. Cutler during an inspection of other homes suffering from water damage.
>
> [Cutler] is correct that Mr. Wheatley was called by [Appellees] as a fact witness. [Appellees] called [Mr.] Wheatley to testify regarding a conversation he had with Mr. Cutler about water problems in other homes. He did not offer an expert opinion about the cause of such problems.
>
> Nonetheless, as noted above, despite the testimony of Mr. Wheatley, the court made its decisions in this case based upon what happened to [Appellees'] home and [Cutler] suffered no harm by this alleged error of court.

Trial Court Order Denying Cutler's Post-Trial Motion, 7/12/2016, at 1 n.1.

Likewise, Appellees point out that they "called Mr. Wheatley as a rebuttal witness solely to impeach Mr. Cutler's testimony that he had no knowledge, prior to 2002, of defective construction practices in other Cutler-built, stucco communities." Appellees' Brief (Second Appeal) at 71 (citations omitted). Moreover, according to Appellees, "[a]t no point did [Appellees'] counsel ask Mr. Wheatley to offer an opinion as to the cause of water infiltration at Springton Woods or to state whether the items he communicated to Mr. Cutler fell below acceptable industry standards or practices." *Id.* at 72 (citation omitted). Instead, they claim that their counsel "asked Mr. Wheatley to testify only as to his personal observations, and that is exactly what Mr. Wheatley did." *Id.* (citation omitted).

Based on our review of the trial transcript, we agree with the trial court and Appellees that Mr. Wheatley's testimony consisted of personal

observations and not expert opinions. ***See*** N.T. Trial, 1/15/2016, at 102-129. Consequently, we discern no abuse of discretion on the part of the trial court, as Mr. Wheatley testified as a fact witness, not an expert.

Thus, not one of Cutler's nineteen issues is meritorious, and we affirm the trial court's judgment on these grounds.

We now turn to Appellees' cross-appeal. On appeal, Appellees raise a single issue for our review:

> Did the trial court err as a matter of law and/or abuse its discretion when it calculated the amount of attorneys' fees awarded to [Appellees] by reducing the amount derived from the lodestar approach by the contingency percentage contained in [Appellees'] fee agreement?

Appellees' Brief (First Appeal) at 7. We evaluate this issue for an abuse of discretion. ***Boehm***, 117 A.3d at 335 (citations omitted). "An abuse of discretion generally will not be found unless there is a showing of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." ***Krebs***, 893 A.2d at 786 (citations and internal quotation marks omitted).

Before addressing the merits of Appellees' issue, we must provide further context regarding the trial court's award of attorneys' fees in this matter. Appellees initially entered into an hourly fee agreement with their counsel. However, because of high litigation costs, Appellees converted this

hourly fee agreement into a contingency fee agreement in August 2015.[29]

As a result, when Appellees first requested attorneys' fees under the UTPCPL

following the bench trial, the trial court awarded attorneys' fees to Appellees

in the total amount of $121,938.51.  This amount reflected $96,749.51 in

fees incurred by Appellees under their original hourly fee agreement with

their counsel, plus 20% of the hourly fees recorded by Appellees' counsel

following the change in the parties' compensation agreement through

January 1, 2016, which amounted to $25,189.38.[30]  **See** TCD at 30;

Appellees' Post-Trial Motion, dated 3/21/2016, at 10 n.4.

---

[29] Appellees initially retained Fox Rothschild LLP on an hourly basis, and agreed to pay the costs incurred with such representation.  Appellees' Brief (First Appeal) at 21 (citations omitted).  However, according to Appellees,

> Cutler's conduct … significantly drove up the cost of litigation such that [Appellees] could not afford to continue paying Fox Rothschild at an hourly rate.  Thus, on August 13, 2015, [Appellees] and Fox Rothschild entered into an agreement converting the previous Hourly Agreement to a contingency agreement (the "Contingency Agreement").  Pursuant to the Contingency Agreement, [Appellees] agreed to pay Fox Rothschild as compensation for the remainder of the representation 20% of all amounts recovered by [Appellees] in the lawsuit, as well as all costs related to the investigation and/or prosecution of their claims against Cutler.

**Id.** at 21-22 (internal citations omitted).  **See also** Cutler's Brief (First Appeal) at 30 (explaining that "Appellees' counsel knowingly and willingly entered into an agreement with … Appellees to move from an hourly fee to a contingent fee on August 13, 2015") (citation omitted).

[30] Appellees explain that the amount of $25,189.38 represents "20% of the total value of the legal services rendered to [Appellees] through January 1, 2016, **after** [Appellees] converted from the Hourly Agreement to the
*(Footnote Continued Next Page)*

Subsequently, in a post-trial motion, Appellees sought supplemental attorneys' fees and costs incurred since January 1, 2016. **See** Trial Court Order Regarding Appellees' Post-Trial Motion, 7/12/2016, at 1 (unnumbered pages). In response, after Appellees submitted relevant legal invoices, the trial court awarded Appellees attorneys' fees pursuant to their UTPCPL claim in the additional amount of $13,254.00 on August 16, 2016. **See** Trial Court Order, 8/16/2016, at 1 (unnumbered pages). It explained that it calculated this amount using the same method as it did in its previous decision, *i.e.*, awarding them 20% of the hourly fees recorded by their counsel. **Id.** at 1 n.2.

Now, on appeal, Appellees assert that "the trial court erred when it calculated the amount of attorneys' fees awarded to [Appellees] by reducing the amount derived from the lodestar approach by the contingency percentage in [Appellees'] fee agreement with counsel." Appellees' Brief (First Appeal) at 54 (unnecessary capitalization and emphasis omitted). In particular, Appellees contend that "the trial court's formula for calculating the awards of attorneys' fees creates an inequitable result that (1) does not further the remedial purposes of the UTPCPL, and (2) violates the settled

---
*(Footnote Continued)*

Contingency Agreement." Appellees' Brief (First Appeal) at 54 (citation omitted; emphasis in original). **See also** TCD at 33 (explaining that $25,189.38 was the product of "$125,189.38 (fees recorded post-contingency) x .20)").

principle that a contingency fee arrangement cannot be used to reduce a fee

award." *Id.* at 54-55.[31]

When awarding attorneys' fees under the UTPCPL, this Court has

stated:

> In a case involving a lawsuit which include[s] claims under the UTPCPL ... the following factors should be considered when assessing the reasonableness of counsel fees:
>
> > (1) The time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the case; (2) The customary charges of the members of the bar for similar services; (3) The amount involved in the controversy and the benefits resulting to the clients from the services; and (4) The contingency or certainty of the compensation.

*Boehm*, 117 A.3d at 335 (internal citations omitted).  Further,

> (1) there should be "a sense of proportionality between an award of damages [under the UTPCPL] and an award of attorney[s'] fees," and (2) whether plaintiff has pursued other theories of recovery in addition to a UTPCPL claim "should [be] given consideration" in arriving at an appropriate award of fees.

*Id.* (citations omitted; some brackets in original).  We "[do] not mandate a

proportion that would be the limit of acceptability," but instead "only

suggest[] that there be a 'sense of proportionality' between the two

amounts.  Nor would it have been appropriate for this Court to fix a

proportionate amount that would define the limit of recoverable fees, since

---

[31] Cutler did not file a brief in response to Appellees' cross-appeal.

the General Assembly specifically chose **not** to include such a factor in the statute." *Id.* (citations omitted; emphasis in original).

In the case *sub judice*, the trial court considered the above factors in determining the reasonableness of Appellees' attorneys' fees. With respect to the first factor concerning time and labor, the trial court found — as discussed above — that Appellees' "UTPCPL claims were intertwined with the non-UTPCPL claims in such a way that separation of those fees would be difficult." TCD at 27. Thus, the trial court determined that much of the time spent in pre-trial litigation pertained to both Appellees' UTPCPL and common law claims. *See id.* (citing **Boehm**, 117 A.3d at 335). It noted that the case involved "many complex construction issues and lengthy pretrial discovery of documents and evidence[,]" along with "highly technical construction issues which required much expert testimony." *Id.* at 28. The trial court relayed that "much of the complexity and difficulty in the preparation of the case for trial stemmed from [Cutler's] refusal to produce documents in accordance with various orders of this court[,]" and the matter was further complicated when Cutler "appealed the court's discovery sanction order on the eve of trial[.]" *Id.* In sum, the trial court recognized that "[n]othing during the life of this litigation was simple. [Cutler] made it expensive." *Id.*

As for the second prong relating to the customary charges of members of the bar for similar services, the trial court found that the fees charged by

Appellees' counsel were "customary and justified." *Id.* Third, in terms of the amount in controversy and the benefits resulting to the clients from the services, the trial court stated that "[t]here can be no doubt that [Appellees] benefited from the series [*sic*] rendered by [their] counsel, having succeeded on all of [their] common law claims and … UTPCPL claims." *Id.* at 29. In response to Cutler's argument that the fees were disproportionate to the amount recoverable, the trial court determined that "[a]lthough the remediation costs were just over $85,000, the potential for treble damages made the amount in controversy significantly higher." *Id.*

Finally, in considering the fourth prong pertaining to the contingency or certainty of the compensation, the trial court explained:

> [Cutler's] final argument is that an award of attorneys' fees in excess of the underlying damages award or which included the hourly fees charged to [Appellees] after … the arrangement between [Appellees] and their counsel became a contingent fee arrangement, would result in a windfall to [Appellees'] counsel. The court again disagrees.
>
> The fee-shifting statutory provision of the UTPCPL is designed to promote its purpose of punishing and deterring unfair and deceptive business practices and to encourage experienced attorneys to litigate such cases, even where recovery is uncertain. *Boehm*, *supra*; *see also Krebs*[], 893 A.2d [at] 788 ("[T]hese cases hold generally that where the General Assembly has departed from the 'American Rule' (where each party is responsible for his or her own attorneys' fees and costs), by providing a fee-shifting remedy in a remedial statute, the trial court's discretionary award or denial of attorneys' fees must be made in a manner consistent with the aims of purposes of that statute."). This case is a good example of this principle.
>
> After [Cutler's] interlocutory appeal of this court's discovery order delayed the impending trial and assured additional,

- 80 -

unforeseen counsel fees related to the appeal, counsel agreed to finish the case with no guarantee of payment and thus allow [Appellees] to have their day in court, which prior to the appeal had been just weeks away. A contingency fee agreement is just one of many factors for a court to consider when determining the appropriateness of an award of reasonable attorneys' fees and thus "it would be inappropriate to apply a contingency fee agreement to create a ceiling (or for that matter, a closed door) on the recovery of attorneys' fees under a fee-shifting provision of a remedial statute." *See Kreb*[*s*], *supra.*

Under [Appellees'] agreement with their counsel, they are required to pay 20% of any funds recovered as attorneys' fees. [Appellees] have already incurred attorneys' fees totaling $96,749.51 and are entitled to recover that amount. In addition to those fees, the court will award 20% of the hourly fees recorded by [Appellees'] counsel following the change in the parties compensation agreement, which totals $25,189.38 [$125,946.88 (total fees recorded less fees previously incurred) x .20]. This award is reasonable in this court's view when one considers the total hourly equivalent of counsel for the time spent [since the contingency agreement took effect].

TCD at 29-30.

It is unclear to us why the trial court decided to calculate attorneys' fees in this manner. Despite acknowledging that Appellees are required to pay 20% of **any funds recovered** under the contingency agreement as attorneys' fees (which Appellees say would amount to $46,495.14),[32] the

---

[32] It is ambiguous to us how much money would be due under the contingency agreement. The August 13, 2015 contingency agreement sets forth, "In consideration for our services, **the Firm shall receive a fee of twenty percent (20%) of all funds recovered or received by you— including compensatory and punitive damages**." *See* Appellees' Exhibit 61 (emphasis added). As stated above, Appellees state that they would be obligated to pay $46,495.14 pursuant to the 20% contingency agreement, although it is uncertain to us how they arrive at this amount. Appellees' Brief (First Appeal) at 57; *see also id.* at 53 ("The trial court awarded
*(Footnote Continued Next Page)*

trial court awarded Appellees only 20% of the hourly fees recorded by their counsel following the change in the compensation agreement (which ultimately totaled $38,443.38 after the trial court issued its supplemental award on August 16, 2016). Moreover, none of the factors discussed above support reducing the attorneys' fees in this way. As Appellees point out, this is effectively "an 80% discount on Fox Rothschild's standard hourly rates[,]" in spite of switching to the contingency agreement in order "to save [Appellees] from the burden of the Cutler-caused increased cost of the litigation…." Appellees' Brief (First Appeal) at 56 (citations omitted).

We recognize that "the UTPCPL allows for the recovery of 'reasonable' attorneys' fees" and was not "intended to provide a claimant, or his attorney, with a windfall or bonanza should he or she be successful." **McCauslin**, 751 A.2d at 686.[33] At the same time, however, we have noted that "the fee-shifting statutory provision of the UTPCPL is designed to

*(Footnote Continued)* —————————

[Appellees] $317,668.78 in total damages…. [Appellees] must pay Fox Rothschild $46,495.15 of that amount pursuant to the 20% contingency."). Cutler, on the other hand, claims that "Appellees and their attorneys had agreed upon a 20% contingency fee, meaning that … Appellees would pay their attorneys 20% of the recovery. The recovery awarded to … Appellees upon the jury trial was $85,980.94. Pursuant to the contingent fee agreement[,] 20% of that award equals $17,196.19." Cutler's Brief (First Appeal) at 30-31 (citations omitted).

[33] Notably, this Court has previously "found a multiple of 11.5 of UTPCPL damages to the attorney fee award was not disproportionate." **See Boehm**, 117 A.3d at 336 (citing **Neal**, 882 A.2d at 1031 n.8). Appellees' attorneys' fees in this case are not remotely close to that disproportion.

promote its purpose of punishing and deterring unfair and deceptive business practices and to encourage experienced attorneys to litigate such cases, even where recovery is uncertain." **Boehm**, 117 A.3d at 336 (citation omitted). In general, "the manner by which attorneys' fees are determined in this Commonwealth, under fee-shifting provisions, is the lodestar approach." **See Krebs**, 893 A.2d at 792-93. The lodestar is the product of "the number of hours reasonably expended on the litigation times a reasonable hourly rate." **Id.** at 790. Additionally, we have found it "inappropriate to apply a contingency fee agreement to create a ceiling (or for that matter, a closed door) on the recovery of attorneys' fees under a fee-shifting provision of a remedial statute." **Id.** Instead, "a contingency fee agreement is just one of many factors to consider in arriving at an award of a reasonable attorneys' fee." **Boehm**, 117 A.3d at 337 (citation omitted).

In this case, despite finding that Appellees' hourly rates were reasonable and that "nothing during the life of this litigation was simple" due to Cutler's uncooperative tactics, the trial court forewent a straightforward application of the lodestar approach and seemed to place unreasonable weight on the fact that Appellees had a 20% contingency agreement with their counsel. **See** TCD at 28. Consequently, we determine that the trial court abused its discretion in calculating Appellees' award of attorneys' fees by apparently limiting Appellees' award of attorneys' fees based on the contingency agreement. Consequently, we vacate the trial court's award of

attorneys' fees and remand this matter for a recalculation of such fees under the lodestar approach.

Judgment affirmed in part, vacated in part, and remanded for reconsideration of the attorneys' fee award consistent with this opinion. Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 10/2/2017*